

FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JAN 23 2014

~Madsen~ C.J.
CHIEF JUSTICE



This opinion was filed for record
at ___9:00 a.m. on 1/23/14

~Ronald R. Carpenter~
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint of<br><br>JONATHAN LEE GENTRY,<br><br>                Petitioner. | NO. 86585-0<br><br>EN BANC<br><br>Filed ___JAN 2 3 2014___ |

STEPHENS, J.—Jonathan Lee Gentry was convicted in 1991 of the aggravated first degree murder of 12-year-old Cassie Holden and sentenced to death by a jury. Gentry is African American and Holden was white. Gentry's direct appeal before this court was unsuccessful. *State v. Gentry*, 125 Wn.2d 570, 888 P.2d 1105 (1995). One of the issues he raised there was a claim that the decision to pursue a capital case against him, and the trial that ensued, was unfairly tainted by the specter of racial bias on the part of the prosecution. *Id.* at 609. We rejected that contention, concluding in part that Gentry had not shown prejudice resulting from any misconduct. Our recent decision in *State v. Monday*, 171 Wn.2d 667, 257 P.3d 551 (2011), makes it clear, however, that when a party shows prosecutorial misconduct based on racial bias, it is the State's burden to show

harmlessness beyond a reasonable doubt. Gentry brings this personal restraint petition in light of *Monday.*

While we believe the rule in *Monday* is critically important to our justice system, we conclude it does not qualify as a "watershed" rule that can be applied retroactively under *Teague v. Lane,* 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989). Nevertheless, because of the gravity of the punishment and the claims here, we wish to stress that even if Gentry's claims were not procedurally barred, they would still fail under the standard imposed by *Monday* because Gentry cannot demonstrate prejudice to merit relief on collateral review. We therefore dismiss his personal restraint petition.[1]

## FACTS

The facts of this case are well known and were summarized in this court's decision on Gentry's direct appeal.

> In early June 1988, the 12-year-old victim lived with her father and stepmother in Pocatello, Idaho. On June 11, 1988, she traveled to Kitsap County, Washington, to spend the summer with her mother at her mother's home near Bremerton. On June 13, 1988, at approximately 4:30 p.m., the young victim went for a walk. She was expected home at 6 p.m. for dinner, but never returned.
>
> Her body was found early June 15, 1988, behind a large log at the bottom of a path running from a trail through a wooded area adjacent to Rolling Hills Golf Course, near Bremerton, Washington. The victim's eyeglasses, earring and a bouquet of flowers were found approximately 148 feet up the footpath on and near the main trail.
>
> The victim appeared to have been sexually assaulted, as her jeans and underpants were pulled down and her T-shirt and bra pulled up. Her blue sweatshirt had been removed from one arm and pulled up, partially

---

[1] In addition to his personal restraint petition, Gentry filed a motion to reconsider pursuant to RAP 2.5(c)(2). The motion is more aptly described as a motion to recall the mandate and is based on the same grounds as Gentry's petition.

covering her face. She had been struck in the head approximately 8 to 15 times, suffering 10 "significant" injuries.

Kitsap County sheriff deputies investigated the murder scene and determined that a trail of blood was splattered from the main trail, down the footpath about 148 feet to where the body was found. They found a 2.2-pound rock that had blue fibers crushed into it. The fibers matched the fibers in the victim's sweatshirt. The rock also had red spots on it that appeared to be blood. The rock was believed to be the murder weapon.

The autopsy showed that the victim had been killed by one of the blows to her head. The results of the autopsy could not show the order in which the blows were received or which blow actually killed the victim. The autopsy did not conclusively show that the young victim had been raped.

During the autopsy several loose hairs were removed from the victim's body. An examination of the hairs showed that most of them were consistent with the victim's own hairs. Two of the hair fragments were recovered from her T-shirt and were Negroid hairs. A coarse brown hair, believed to be a pubic hair from a Caucasian, was found on the victim's left thigh and a red pigmented hair was found on one of her shoes. The Negroid hair was later determined to be genetically consistent with the Defendant's brother's arm hair. Defendant's brother was not in Kitsap County at the time of the murder. Evidence was produced to show that the Defendant, who lived with his brother's family, wore his brother's clothes on occasion. There was no identification connected with the Caucasian hair.

The investigation eventually focused on the Defendant. A search of his residence was conducted and clothing samples, including a pair of shoes, were seized. Examination of the shoes indicated that blood had been wiped from the shoes. Spots of blood were found on the shoelaces and those bloodstains were the subject of a number of scientific tests. These [tests matched the blood to Holden's type; 0.18% percent of the population would have this type. . . .] [T]esting was also conducted on a hair found in the victim's T-shirt which yielded a PCR [(polymerase chain reaction)] type of 1.2, 1.2, which is not the same as the Defendant's type, but does match his brother's type.

A [*State v.*] *Frye*[, 54 App. D.C. 46, 293 F. 1013 (1923)] hearing was conducted over the course of 6 weeks. The trial court concluded that the scientific evidence was reliable and should be admitted.

Other evidence linking Defendant to the murder included the testimony of three persons who reported seeing a man matching Defendant's description near the place of the murder and around the time of the murder, and three former jailmates of the Defendant who testified that the Defendant admitted to them he had killed someone. The testimony of these witnesses was essentially as follows.

Witness E.S. and her daughter, K.T. testified that they had seen an African American man walking past E.S.'s home toward Rolling Hills Golf Course between 4 p.m. and 7 p.m. on June 13, 1988. The man was wearing a cap, a sports jacket and slacks. His clothing was described as scruffy and of a light color. E.S. later identified the individual as the Defendant,

Jonathan Gentry. At the time of the murder, the Defendant was residing in the home of his brother and sister-in-law a short distance from E.S.'s home and the Rolling Hills Golf Course.

Witness F.B. was a bicyclist who had ridden the trails in the wooded area near Rolling Hills Golf Course a number of times. On June 13, 1988, the day of the homicide, he and a friend went to the area after work and rode the main trail from Riddell Road, south of the golf course, to the golf course and back. F.B. then traveled from Riddell Road, along the main trail to McWilliams Road. During this last time across the path, at approximately 5:30 p.m., he saw an African American man standing just off the main trail. F.B.'s description of the man was consistent with that given by E.S.

Witness B.D. had been incarcerated in the Kitsap County Jail with the Defendant in the summer of 1988. He testified that he and the Defendant were playing cards when detectives arrived to take samples of Defendant's hair in connection with the investigation of the victim's murder. B.D. testified that when the Defendant returned to the card game, Defendant said, "They found my hair on the bitch." When B.D. asked the Defendant whether he had killed the young girl, he said that he had but that they could not prove it.

Witness T.H. had been incarcerated with the Defendant at the Washington State Correctional Center at Shelton in December 1989 and January 1990. He testified that the Defendant told him that he had killed a 10-year-old girl who lived across the street from his brother's house because he thought she was leading him on. This statement was made, according to T.H., during a card game and others, including inmate L.S., were present.

L.S. testified that the Defendant told him that he had killed his girlfriend and disposed of her body.

The jury found the Defendant guilty of premeditated first degree murder and of felony murder. The jury additionally found that the murder was committed to conceal the identity of a person committing a crime, thus finding an aggravating circumstance which subjected Defendant to the possibility of a death sentence.

*Gentry*, 125 Wn.2d at 579-82. This court affirmed Gentry's conviction and remanded for issuance of a death warrant. *Id.* at 658. The court also rejected a subsequent personal restraint petition. *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 972 P.2d 1250 (1999).

Gentry filed this personal restraint petition in October 2011. On October 10, 2012, Gentry filed a motion to ask that this court set oral argument or alternatively

remand for supplementation of the record or reference hearing in light of *State v. Davis,* 175 Wn.2d 287, 362-73, 290 P.3d 43 (2012). We denied Gentry's motion to supplement or remand in light of *Davis* and struck the portions of his briefing dealing with *Davis.*[2] We granted his request for oral argument. Amici curiae American Civil Liberties Union, American Civil Liberties Union of Washington (hereinafter ACLU), and NAACP Legal Defense and Educational Fund Inc. filed briefs in support of Gentry.[3]

## ANALYSIS

Gentry claims the prosecution engaged in race-based misconduct tainting his conviction in the following ways: (1) by making an out-of-court racially offensive

---

[2] The dissent is concerned that our decision to deny Gentry a remand for a reference hearing in light of *Davis* means we have sidestepped our duty under RCW 10.95.130(2)(b) to conduct a proportionality review in every capital case. Dissent at 1. But Gentry received his proportionality review on his direct appeal. *Gentry,* 125 Wn.2d at 654-58. Nothing in RCW 10.95.130(2)(b) requires this court to consider proportionality anew each time an inmate on death row files a personal restraint petition. It certainly does not allow us to circumvent the one year time bar on personal restraint petitions and engage in a proportionality review premised on an otherwise untimely petition.

[3] In his response to the briefs of amici, Gentry appended a letter from the Department of Justice that was sent to a district attorney's office in Mississippi. The letter included assertions about the scientific validity of microscopic hair comparison analysis. The State moved to strike the appendix, arguing that the letter falls outside the scope of the record and has little relevance. We passed the motion to strike to the merits, and grant it now. The State is correct that the appendix is an improper addition to the record on review. Having granted the State's motion, we need not consider a later motion filed by the State seeking to supplement the record with postconviction DNA (deoxyribonucleic acid) evidence, which it claims rebuts the letter.

Likewise, in the course of rendering this opinion, we also do not consider any statistical-based claims made by the parties or amici about the efficacy of the death penalty. Those claims fall outside the scope of the only claim that can overcome the one-year time bar on collateral attack, namely Gentry's claim of race-based prosecutorial conduct premised on our *Monday* decision. *See infra* 28-29.

comment to Gentry's African American counsel; (2) by offering the testimony of a white witness who used the word "nigger" several times and made other racially inflammatory remarks; (3) by offering the testimony of white witnesses who stated that Gentry had referred to the victim as a "bitch," a word that was then repeated several times by the prosecutor in closing; (4) by making numerous statements that focused on physical evidence described as having "Negroid characteristics;" and (5) by suggesting, through argument and the presentation of evidence, that the killer was black and that Gentry was therefore the killer because he is black. Gentry emphasizes that these instances of misconduct must be considered against the backdrop of the crime at issue—a racially inflammatory scenario in which an African American man is accused of murdering a white girl. He also argues that these instances must be viewed in light of the circumstances under which Gentry was charged and tried: Gentry was sentenced by an all-white jury in a courtroom presided over by a white judge; as an African American, Gentry is the only defendant from Kitsap County who is on death row for aggravated murder; and African Americans constitute a disproportionate number of inmates on Washington's death row.

Gentry's arguments implicate our holding in *Monday*. There, the prosecutor made a number of racially charged remarks throughout the trial of Kevin L. Monday on charges of first degree murder and assault. Monday and most of the lay witnesses called were African American. Among other things, the prosecutor suggested that the African American witnesses could not be believed because of a

"'code'" on the street that "'black folk don't testify against black folk.'" *Monday*, 171 Wn.2d at 674 (quoting Verbatim Report of Proceedings (VRP) at 29-30). He also mimicked African American witnesses, saying "'po-leese'" during questioning and audibly expressing his disbelief at a witness's answer. *Id.* at 671-72. We held that the defendant met his burden of proving the prosecutor's actions were improper. *Id.* at 678. But we departed at that point from our previous requirement that the defendant also show prejudice stemming from the prosecutorial misconduct. Once the showing of misconduct is made, we held in *Monday*, the burden shifted to the State to show the race-based misconduct was harmless beyond a reasonable doubt, i.e., that it is beyond a reasonable doubt that the conduct did not affect the jury's verdict. *Id.* at 680. In *Monday*, the evidence that the defendant had committed the crime at issue was quite strong.[4] But, the prosecutor's misconduct was so pervasive that nearly every witness's testimony was tainted by it. Under those circumstances, we held that the State could not make the harmlessness showing. *Id.* at 681. Despite the strong evidence of Monday's guilt, the taint of the improper conduct pervaded the trial, making it impossible to say whether the jury could have come to a conclusion not influenced by racial bias.

In light of *Monday*, Gentry maintains that his allegations of racial bias should be reviewed anew. We must therefore first address whether Gentry can

---

[4] The defendant told police during questioning that he had not meant to kill the victim, and there was a videotape of the event showing the defendant to be the shooter. *Monday*, 171 Wn.2d at 670, 680 n.4.

benefit from the rule in *Monday*. This requires consideration of whether *Monday* qualifies as a change in the law that justifies Gentry's late-filed petition and whether the rule of *Monday* may be applied retroactively.

1. Is Gentry's personal restraint petition procedurally barred?

Because Gentry's judgment and sentence became final several years ago, he is outside the one-year period for collaterally attacking a conviction. This court may review an untimely filed petition only if one of the exceptions to the time bar set forth in RCW 10.73.100 is present. Here, Gentry argues that his petition falls under RCW 10.73.100(6), which excuses late filings where

> [(1)] [t]here has been a significant change in the law, whether substantive or procedural, which is [(2)] material to the conviction, sentence, or other order entered in a criminal or civil proceeding instituted by the state or local government, and [(3)] either the legislature has expressly provided that the change in the law is to be applied retroactively, or a court, in interpreting a change in the law that lacks express legislative intent regarding retroactive application, determines that sufficient reasons exist to require retroactive application of the changed legal standard.

RCW 10.73.100(6); Pers. Restraint Pet. at 18-20.

> a. Does the rule in *Monday* present a significant, material change in the law satisfying RCW 10.73.090?

The State argues that *Monday* cannot be applied retroactively, relying on the retroactivity analysis set forth in *Teague*, 489 U.S. 288. Resp. to Pers. Restraint Pet. and Mot. to Reconsider Appeal (Response) at 46. Gentry asserts that *Teague*'s retroactivity analysis need not dictate how RCW 10.73.100 is interpreted and applied. Gentry claims that "post conviction review may be available under state

law where it would not be under federal law." Pet'r/Appellant's Reply Br. (Reply) at 2.

The State and Gentry at times conflate the two-fold nature of this question. RCW 10.73.100(6) sets forth three conditions that must be met before a petitioner can overcome the one-year time bar: (1) a substantial change in the law (2) that is material and (3) that applies retroactively. Gentry is likely correct that *Monday* constitutes a significant change in the law, material to his conviction, thus excusing the late-filed petition under RCW 10.73.100(6). The State does not seriously debate that point. *See* Response at 47 (conceding that *Monday* announces a new rule); *see also Monday*, 171 Wn.2d at 680 (explaining that the decision was charting a new course in the endeavor to prevent prosecutorial misconduct because "past efforts to address prosecutorial misconduct have proved insufficient to deter such conduct").[5] But retroactivity is a distinct question. *See In re Pers. Restraint of Vandervlugt*, 120 Wn.2d 427, 435-36, 842 P.2d 950 (1992) (recognizing separate inquiries as to whether a rule is a change in the law and whether it may be applied retroactively); *In re Pers. Restraint of Taylor*, 105 Wn.2d 683, 689, 717 P.2d 755 (1986) (noting that a recent case constituted a change in the law, leaving the remaining issue as to whether the case could be applied retroactively). Because Gentry's petition, insofar as the State responds to it, thus far satisfies RCW 10.73.100(6), we proceed to the retroactivity inquiry.

---

[5] In the absence of any debate from the parties on this point, we save for another day the question of what constitutes a "material" change in the law for purposes of the statute.

b. May this court apply the rule in *Monday* retroactively to Gentry's case?

A material change in the law does not necessarily mean a defendant whose judgment was final at the time the change was announced gets the benefit of that change. That is what a retroactivity analysis seeks to address. We have generally adhered to the test announced in *Teague* to determine questions of retroactivity. As we explain below, the rule in *Monday* does not meet the *Teague* test. But given the grave nature of the punishment at stake here, Gentry's claim that this court need not be bound by *Teague* deserves careful consideration, and we begin with that discussion.

(1) Is the court bound by the *Teague* analysis?

There is some support for Gentry's assertion that this court need not be bound by *Teague*. The United States Supreme Court has suggested as much. In *Danforth v. Minnesota*, 552 U.S. 264, 128 S. Ct. 1029, 169 L. Ed. 2d 859 (2008), the court explained:

> It is thus abundantly clear that the *Teague* rule of nonretroactivity was fashioned to achieve the goals of federal habeas while minimizing federal intrusion into state criminal proceedings. It was intended to limit the authority of federal courts to overturn state convictions—not to limit a state court's authority to grant relief for violations of new rules of constitutional law when reviewing its own State's convictions.

*Id.* at 280-81; *see* Reply at 6 (citing *Danforth*).

Gentry appears to advocate for an analysis that looks to whether the "ends of justice" are served by allowing retroactive application of a new rule. *See* Reply at 2 (citing *Vandervlugt*, 120 Wn.2d 427). However, *Vandervlugt* does not set forth a

clear alternative to *Teague*. There, this court considered whether an intervening change in the law qualified as a material change. Deciding that it was material, and therefore overcame one of the hurdles in RCW 10.73.100, the court then considered whether the new rule had retroactive effect. At that point, however, the court determined the rule in question was not "new" because it flowed from a decision interpreting the meaning of a statute, which is "'what the statute has meant since its enactment.'" *Vandervlugt*, 120 Wn.2d at 436 (emphasis omitted) (quoting *In re Pers. Restraint of Moore*, 116 Wn.2d 30, 37, 803 P.2d 300 (1991)). In other words, a rule may be a material change in the law, but still not be a "new" rule for the purposes of *Teague*. *Vandervlugt* thus declined to apply any retroactivity test, *Teague* or otherwise.

Gentry also relies on *Taylor*, 105 Wn.2d 683, which *Vandervlugt* cites. *Taylor* does use a different test than the one advanced in *Teague*. *Taylor*, 105 Wn.2d. at 690-92. But it also predates *Teague* by several years, so it cannot, alone, be viewed as providing an alternative to *Teague*. There is still no published Washington case that departs from *Teague* in light of *Danforth*, and Gentry's briefing does not provide such an analysis. We therefore analyze the retroactivity question presented in this case under the *Teague* analysis we have relied on to date.

(2) Under *Teague*, is the rule in *Monday* retroactive?

We first adopted the *Teague* test in *In re Personal Restraint of St. Pierre*, 118 Wn.2d 321, 327, 823 P.2d 492 (1992). Since *St. Pierre*, we have often looked to *Teague* to guide us in determining whether a new rule may be applied

retroactively. *See In re Pers. Restraint of Jackson,* 175 Wn.2d 155, 283 P.3d 1089 (2012); *In re Pers. Restraint of Scott,* 173 Wn.2d 911, 271 P.3d 218 (2012); *State v. Kilgore,* 167 Wn.2d 28, 216 P.3d 393 (2009); *In re Pers. Restraint of Hinton,* 152 Wn.2d 853, 100 P.3d 801 (2004).

Under *Teague,* if a rule is new, as it is agreed that the rule from *Monday* is, then it will have retroactive application in one of two instances. It must either be a substantive rule that places certain behavior "'beyond the power of the criminal law-making authority to proscribe'" or a watershed rule of criminal procedure "'implicit in the concept of ordered liberty.'" *Teague,* 489 U.S. at 311 (internal quotation marks omitted) (quoting *Mackey v. United States,* 401 U.S. 667, 692-93, 91 S. Ct. 1160, 28 L. Ed. 2d 404 (1971)). Recognition of such procedural rules is limited to "those new procedures without which the likelihood of an accurate conviction is seriously diminished." *Id.* at 313.

*Teague* presents a very high hurdle to overcome. In announcing watershed rules, courts have been sparing to the point of unwillingness. *See In re Pers. Restraint of Markel,* 154 Wn.2d 262, 269 n.2, 111 P.3d 249 (2005) (noting that in review of 11 claimed watershed rules, the United States Supreme Court had yet to declare any a watershed rule triggering retroactivity). The United States Supreme Court has cited the rule announced in *Gideon v. Wainwright,*[6] guaranteeing the right to counsel for criminal defendants, as an example of a watershed rule of criminal procedure, though the decision in *Gideon* predated *Teague* by several

---

[6] 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963).

years. *Saffle v. Parks*, 494 U.S. 484, 495, 110 S. Ct. 1257, 108 L. Ed. 2d 415 (1990). But the United States Supreme Court has stopped short of recognizing any other instance of the type of rule it discussed in *Teague*. Likewise, we have yet to announce such a rule, though we have several times concluded a rule does not meet the *Teague* requirements. *See Markel*, 154 Wn.2d at 273 (holding the rule announced in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), is not a watershed rule of criminal procedure); *State v. Evans*, 154 Wn.2d 438, 447-48, 114 P.3d 627 (2005) (same with regard to *Apprendi*[7] and *Blakely*[8] rules).

On the other hand, federal lower courts have found some rules to apply retroactively. Notably, in *Hall v. Kelso*, 892 F.2d 1541, 1543 n.1 (11th Cir. 1990), the Eleventh Circuit explained that

> a burden-shifting error would be subject to retroactive correction on habeas review because not only is it a "bedrock, 'axiomatic and elementary' [constitutional] principle," *Yates v. Aiken*, 484 U.S. 211, 108 S. Ct. 534, 536, 98 L. Ed. 2d 546 (1988) (quoting *Francis v. Franklin*, 471 U.S. 307, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985) (quoting *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970))), but it is also an error that diminishes the "likelihood of an accurate conviction." *Teague*, [489] U.S. at [290], 109 S. Ct. at 1077 (plurality).

*Monday* does announce a new burden-shifting rule, though this rule speaks to the harmless error analysis and does not involve a burden going to an element of a crime, as *Hall* considered. *See Hall*, 892 F.2d at 1542. But there is no doubt that

---

[7] *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

[8] *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

the *Monday* court considered the possible taint of racial bias in a criminal trial to be of extremely grave concern affecting the legitimacy of the jury's verdict.

> The notion that the State's representative in a criminal trial, the prosecutor, should seek to achieve a conviction by resorting to racist arguments is so fundamentally opposed to our founding principles, values, and fabric of our justice system that it should not need to be explained. [Intentional appeals to racial bias by the prosecution are] so repugnant to the concept of an impartial trial that its very existence demands that appellate courts set appropriate standards to deter such conduct.

*Monday*, 171 Wn.2d at 680. Such language underscores the importance of the rule announced in *Monday* to our criminal justice system. Other states have similarly indicated that the specter of race-based prosecutorial misconduct shakes the very foundation of a fair system of justice, suggesting that a rule such as we announced in *Monday* may qualify as a watershed rule. *See, e.g., Samaniego v. State*, 679 N.E.2d 944, 949-50 (Ind. Ct. App. 1997) (explaining that race-based prosecutorial misconduct may amount to a fundamental error depriving the defendant of a fair trial); *Commonwealth v. Tirado*, 473 Pa. 468, 473, 375 A.2d 336, (1977) (noting that "[a]ppeals to racial or religious prejudice are especially incompatible with the concept of a fair trial because of the likelihood that reason will be dethroned and that bias and emotion will reign"); *State v. Cabrera*, 700 N.W.2d 469, 475 (Minn. 2005) (observing that prosecutor's race-based misconduct undermined prosecutor's obligation to ensure that the defendant received a fair trial).

Nonetheless, we cannot avoid the fact that the *Teague* analysis almost never results in retroactive application of a rule of criminal procedure. We have not found, nor has Gentry presented, any case that retroactively applies a close enough

analog to the rule in *Monday*. *Teague* itself involved claims of racial bias under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and the court recognized the *Batson* rule did not apply retroactively. *Teague*, 489 U.S. at 295-96 (citing *Allen v. Hardy*, 478 U.S. 255, 106 S. Ct. 2878, 92 L. Ed. 2d 199 (1986) and *Linkletter v. Walker*, 381 U.S. 618, 85 S. Ct. 1731, 14 L. Ed. 2d 601 (1965)). Following *Teague*, we cannot conclude that the rule announced in *Monday* applies retroactively.

While this conclusion answers the central question in this case, it is important to recognize that Gentry's claim arises on collateral review. We are mindful that a retroactive application of the *Monday* rule in the context of a personal restraint petition would still require the petitioner to demonstrate actual and substantial prejudice arising from race-based misconduct at trial. *In re Pers. Restraint of Hagler*, 97 Wn.2d 818, 825-27, 650 P.2d 1103 (1982). As an institution firmly committed to justice in substance, not merely name, we feel it is important to further consider whether the misconduct at Gentry's trial resulted in actual and substantial prejudice. Such an inquiry fulfills our constitutional duty to ensure that a sentence of death is not the result of improper racial prejudice.

2. Has Gentry shown actual and substantial prejudice entitling him to relief on this personal restraint petition?

As noted, proof of reversible error under this court's decision in *Monday* requires a finding of race-based misconduct and a finding that such misconduct was not harmless beyond a reasonable doubt. 171 Wn.2d at 680. We first consider

whether Gentry has established race-based misconduct and then consider whether he has shown prejudice, viz., the absence of harmless error.

a. Has Gentry shown improper race-based conduct on the part of the prosecutor?

Misconduct occurs when the State's action is both improper and prejudicial. *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009); *State v. McKenzie*, 157 Wn.2d 44, 52, 57, 134 P.3d 221 (2006). We do not review allegations of misconduct in isolation, but in the context of the trial as a whole. *McKenzie*, 157 Wn.2d at 52. Gentry alleges several specific instances of misconduct, most of which were considered by the court in Gentry's direct appeal. We now examine the conduct through the lens of *Monday*.

(1) Out-of-court comment by prosecutor to Gentry's counsel

The events surrounding this alleged instance of prosecutorial misconduct are detailed in an oral ruling from Judge Karen Strombom, who was appointed to decide a motion Gentry brought to disqualify the Kitsap County Prosecuting Attorney's Office in the wake of the comment. Judge Strombom first noted that "[b]y the end of February 27th, 1991, there was an extremely tense atmosphere in the courtroom, particularly between the attorneys." Suppl. VRP at 424-25 (Decl. of Timothy K. Ford, Ex. 16). The lead attorneys involved were Gentry's counsel, Jeffrey Robinson, and Kitsap County Prosecutor C. Danny Clem. Prior to February 27, allegations of unethical behavior had been made against the State. *Id.* at 425. As Judge Strombom explained, on February 27, 1991, the third day of a

contentious *Frye*[9] hearing was winding down. After proceedings ended for the day, Robinson approached Clem to inquire about the witness list for the next day. *Id.* Clem refused to disclose the witnesses and a verbal altercation ensued, though the exact language of the argument was disputed. It is undisputed, however, that as Robinson walked away from Clem, Clem called after Robinson, "Where did you learn your ethics? In Harlem?" *Id.* at 425-26.

The "Harlem comment" forms the basis of one of Gentry's claims of race-based prosecutorial misconduct. This court has already concluded that the comment was "racially offensive" and "totally inappropriate." *Gentry*, 125 Wn.2d at 610.

(2) Use of race-based language

Gentry claims the capital proceeding against him was "steeped in race." Pers. Restraint Pet. at 12. He argues that racially charged language was used in an attempt to evoke race-based prejudices on the part of the jury. He takes issue with the use of the word "nigger" by a witness and the use of the word "Negroid" by prosecutors.

(a) Use of the word "nigger"

One of the witnesses who testified against Gentry was jailhouse informant Brian Dyste. As he does now, Gentry took issue with Dyste's testimony on direct appeal before this court.

---

[9] *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923).

> The jailhouse informant in question had told police that he and the Defendant were incarcerated at the Kitsap County Jail and were playing a "nigger" card game when the Defendant left the room to provide hair samples to police investigators. When he returned to the card game, the Defendant allegedly said, "They found my hairs on the bitch". During direct examination, the prosecuting attorney questioned the informant about his use of the word "nigger" and about his attitude toward African Americans.

*Gentry*, 125 Wn.2d at 611. Gentry points to this testimony, and the prosecutor's handling of it, to support his assertion that the prosecution's case was "steeped in race," to his detriment. Pers. Restraint Pet. at 12. But we have already concluded that in this instance, the prosecutor's conduct was not improper.

> The State's questioning of the informant appears to have been a strategic attempt to soften the impact of apparent racist attitudes by bringing them out on direct examination, rather than waiting for defense counsel to expose them on cross examination. That is an accepted trial tactic. The questions do not appear to have been asked in order to evoke racial prejudices in the jury. . . . If anything, the State's examination of this witness appears to have made him a less credible witness.

*Gentry*, 125 Wn.2d at 611. Nothing in *Monday* compels us to retreat from this conclusion, and Gentry offers no additional evidence that alters it. As we concluded in 1995, while anyone's use of the word "nigger" is repugnant, there was nothing improper about the State's presentation of Dyste's testimony.

### (b) Use of the word "Negroid"

At certain places in his briefing, Gentry also appears to bolster his assertions of racially based prosecutorial misconduct by citing to the prosecution's use of the word "Negroid." *See* Pers. Restraint Pet. at 12 (noting 254 explicit references to race in the trial transcript with use of the words "black," "nigger," or "Negroid"). At trial, the State frequently referred to some forensic evidence as having

"Negroid" characteristics, such as hair samples. The State points out that "'Negroid'" is not a racist term but a term of art used in the forensic hair analysis community." Response at 64. The prosecution's use of the word does not in any way appear to be an appeal to race-based prejudices, and we reject the claim that it was improper.[10] Gentry has not shown an improper use of race-based or pejorative language at trial by the State.

### (3) Prosecutor's closing argument

Aside from Dyste, another jailhouse informant testified that Gentry had referred to the victim as "a bitch." Response at 34. The prosecutor repeated this phrasing several times in closing during the penalty phase, attributing it to Gentry. Gentry argues that "[i]In the late 1980s, the word 'bitch' was strongly associated with negative stereotypes of African American men and 'gangsta rap.'" Pers. Restraint Pet. at 14-15. Thus, he argues, the prosecution's repeated use of the word "bitch" in closing is the type of "'careful word[] here and there [that] can trigger racial bias'" we found so repugnant in *Monday*. *Id.* at 24 (quoting *Monday*, 171 Wn.2d at 678).

---

[10] The brief of amicus curiae NAACP Legal Defense and Education Fund Inc. (NAACP) (Br. of NAACP) argues that the scientific evidence suggesting hair can come from a particular racial group has been debunked. Br. of NAACP at 16 n.22. Gentry adopts this argument. Pet'r's Resp. to Amicus Curiae Brs. of NAACP and ACLU (Resp. to Amici) at 1-2. If Gentry's conviction was based on faulty science, this is of course troubling. But Gentry's argument in this petition concerns race-based prosecutorial misconduct, not new or insufficient evidence. At the time of the trial, there was no challenge to the science describing the hair as "Negroid," and thus it is difficult to see how it was improper, let alone indicative of racial bias, for the prosecution to rely on it. *See Gentry*, 125 Wn.2d at 581 (explaining that the trial court found, following a *Frye* hearing, that the science was reliable).

The State responds that there is nothing in the prosecutor's use of the word "bitch" that is meant to evoke race-based prejudices. Instead it was used to "highlight Gentry's callousness and misogyny." Response at 69.

We cannot conclude that the prosecutor's use of the word "bitch" on several occasions was used for the purpose of triggering race-based bias. In *Monday*, we found improper conduct when a white prosecutor repeatedly pronounced "police" as "po-leese" while questioning African American witnesses, employed an incredulous tone during questioning, and suggested in his closing argument that African American people are liars. 171 Wn.2d at 679. It was clear from the record there that the prosecution's strategy rested, in part, on discrediting black witnesses on the basis of their race. Here, the evidence suggested Gentry had referred to Holden as a bitch. Acknowledging that term's association with African American urban culture in the late 1980s, it was not improper for the prosecutor to highlight the defendant's use of a derogatory term about his victim, regardless of their respective races. The record does not suggest that the prosecutor's decision to bring that point to the jury's attention on repeated occasions reflected racial bias. We need not consider whether such behavior amounted to prosecutorial misconduct under *Monday* because it was not improper.

In closing on the penalty phase, the prosecutor also made reference to the Biblical story of David and Goliath. As he did on direct review, Gentry argues that this was improper race-based argument. He renews his argument on the ground that under direct review, this court rejected his claim after erroneously imposing

the burden of prejudice on him. But on direct review, this court concluded that the prosecutor's remarks about David and Goliath were *neither* improper *nor* prejudicial.

> The Defendant argues that the State's reference to the Biblical story of David and Goliath was intended to evoke racist feelings. The Defendant claims that the use of the David and Goliath analogy evokes an image of the outsider from another tribe killing a member of the "children of Israel". *In our view, this is a tortured interpretation of the use of this Biblical story.*
> *Instead, the rebuttal here was invited or provoked by defense counsel's extensive use of Biblical stories during his own closing argument.* In any event, if the remark was prejudicial at all, it was not so prejudicial that it could not have been cured with a cautionary explanation to the jury, had one been requested.

*Gentry*, 125 Wn.2d at 644 (emphasis added). As noted, *Monday* does not disturb our conclusion regarding the propriety of the conduct. As we did in 1995, we conclude that there was nothing improper in the prosecution's reference to the David and Goliath story.

(4) Presentation of evidence and focus on Gentry as the killer

Gentry also argues that the prosecution's presentation of the evidence showed an improper focus on race. Pers. Restraint Pet. at 22-24. This argument is closely related to Gentry's contention that race drove law enforcement's suspicion of Gentry, i.e., that the evidence did not point to Gentry so much as to an African American man. As in *Monday*, claims Gentry, the prosecution "resorted to 'generalizations about racial . . . groups in order to obtain [a] conviction[].'" Pers. Restraint Pet. at 23 (citing *Monday*, 171 Wn.2d at 683 (Madsen, C.J., concurring)). These two arguments require consideration of the evidence against Gentry, most of which was discussed in Gentry's direct appeal.

First, three witnesses placed Gentry in the immediate vicinity of the murder. *See Gentry,* 125 Wn.2d at 581. Fred Buxton had been mountain biking around the time of the murder in the area Holden was killed. After reading about her death in the newspaper three days after it happened, he recalled seeing an individual on the trail who had seemed out of place. The individual was oddly dressed for the weather, in a long coat or shirt open at the front, and wearing a distinctive hat. It turned out Buxton had seen this person about 40 yards from where Holden was killed, possibly minutes after the murder. He called police and provided a composite sketch. He later identified Gentry out of a photomontage. Eilene Starzman contacted police after she saw the composite sketch of the suspect. She and her daughter recalled seeing a similar-looking man near the scene of the crime around the time the murder was believed to have taken place. Her description of the person's clothing was similar to Buxton's description, including the distinctive hat. After talking with police and believing the suspect might live in her neighborhood, Starzman began talking with neighbors and eventually located Gentry's home. Police subsequently apprehended him.

In addition to eyewitness accounts placing Gentry near the scene of the crime, the State recovered several hair strands from the body. A pubic hair that likely came from a Caucasian individual was found on Holden's left thigh. Another hair, red-pigmented and likely of Caucasian origin, was found on her shoe. Finally, two hairs containing Negroid characteristics were found on Holden's t-shirt, which she had been wearing at the time of her murder under a

sweatshirt; the hairs were tucked between the sweatshirt and the t-shirt. When tested, both hairs were a type match for the hair of Gentry's brother, Edward. Approximately six percent of the black population would have hair of that type. Gentry's brother was at sea at the time of the murder and was not a suspect. But, the State also presented evidence that Gentry had been wearing clothing borrowed from his brother at the time of the murder. And, Holden and Gentry did not know each other, nor did she know Gentry's family.

Finally, a pair of Gentry's shoes were found to have been spattered with blood, and then cleaned. The blood spatter testing revealed that the blood matched Holden and could have come from only 0.18 percent of Caucasians. *Gentry,* 125 Wn.2d at 581.

It is true that the State made many references to race in the trial. But these were legitimately tied to the physical and circumstantial evidence pointing to Gentry as the killer. For example, the State's repeated references to racial characteristics during testimony concerning the hair samples were appropriate. It is true that the State offered no explanation for the Caucasian pubic hair. But a hair matching hair from Gentry's brother was found on Holden's body. Given that Gentry was seen in the area at the time of the murder, and that blood matching Holden's was found on Gentry's shoes, it hardly seems improper for the State to have discussed the racial characteristics of the hair samples when the prime suspect was African American. And given that the sample would have matched only six percent of the African American population, it hardly seems improper for the State

to ask questions designed to exclude other sources of the hair, especially because individuals easily shed and pass on hair strands. *See* Response at 39 (discussing questions at trial that detailed the lack of viable sources for the hair other than Gentry, i.e., that Holden's family did not utilize laundromats, that Holden had not played with any African American children since arriving from Pocatello, Idaho, two days before her murder, and that no one who had contact with Holden's body after it was discovered was African American).[11]

Gentry takes issue with the State's attempt to narrow the universe of Holden's association with persons of color to Gentry. He asserts that the State's belief "that a black man committed the crime is based on its factually unsupportable claim that Cassie and her family did not associate with black people." Reply at 11. Gentry points to the State's questioning regarding Holden's contacts with black children in the days before her murder, asserting that the State incorrectly suggested Holden had no association with black playmates before she died. On this point, it appears Gentry may be correct.

The State concedes its presentation suggested that Holden had no association with persons of color in the days before her death. Response at 39 (citing 52 VRP 3665, 3693-94, 3703, 3714). But in fact, police records reveal that Holden had a brief conversation with an African American child, her brother's friend Tyler, in the outdoor common area of their apartment complex the night before her murder,

---

[11] Samples were taken from Holden's mother and her brother Jamie to test against hairs found at the crime scene.

where a number of children were gathered. Decl. of Timothy K. Ford, Ex. 9 (Decl. of Jennifer Davis, Ex. B, June 14, 1988 Interview with Jamie Holden at 3). And, it is true that police records also reveal Holden's brother, Jamie, invited African American children besides Tyler into the Holden home in the hours after Holden went missing, though nothing in the record indicated if those children had ever been in the Holden house before. Decl. of Timothy K. Ford, Ex. 9 (Decl. of Jennifer Davis, Ex. B, June 15, 1988 Interview with Jamie Holden at 7).[12] Hair from these various children was not tested, and it is within the realm of possibility that the African American hair fragments recovered could have come from them.

But the fact that hair from these children was not tested does not show bias or improper conduct on the part of the State. The hair matched a family member of Gentry. Gentry was seen by two eyewitnesses in the area.[13] Blood on Gentry's shoes matched Holden's. These facts indicate the State pursued a legitimate prosecution against a man who is African American, not against a man because he

---

[12] Exhibit 9 consists of separate interviews with the Holden family, including two different interviews with Jamie.

[13] The NAACP argues that these witnesses demonstrate the State sought to use Gentry's "race as a proxy for guilt throughout the trial." Br. of NAACP at 10. It claims that the testimony of two witnesses in particular "inappropriately suggested that a Black man would only be in a White neighborhood to commit a crime" and "legitimized the idea that White people had reason to fear African Americans in general and Mr. Gentry in particular." *Id.* The entirety of the testimony in question does not bear out this assertion. In context, the witnesses' statements about Gentry being out of place went to his clothing, not his race. It was a hot day, and all the eyewitnesses testified that he was overdressed for the weather. *See* 56 VRP 126-28; 57 VRP 145-46, 195-96; *see also State v. Allen,* 176 Wn.2d 611, 624-26, 294 P.3d 679 (2013) (holding that trial court did not abuse its discretion in refusing to give a cautionary cross-racial identification jury instruction where the white eyewitness based his identification mostly on the African American defendant's clothing and accessories, rather than on the defendant's race).

is African American. In light of the foregoing discussion, we conclude that there was nothing improper in the State's focus on Gentry during the investigation phase or in the presentation of the evidence against him.

(5)  Overall conduct

Even when viewed against the backdrop of the systemic racism Gentry posits (e.g., the all-white jury, the history of charging decisions), it is difficult to come to the conclusion that most of the conduct complained of was improperly race-based. That is not to say that Gentry is incorrect when he complains that the criminal justice system and the death penalty process in particular is plagued by race-based inequities. *See, e.g.,* BRYAN C. EDELMAN, RACIAL PREJUDICE, JUROR EMPATHY, AND SENTENCING IN DEATH PENALTY CASES (2006). But the broader inequities do not mean the prosecution here engaged in improper conduct within the contemplation of our decision in *Monday.* To the contrary, a careful review of the evidence and its presentation does not support Gentry's assertions of race-based misconduct, other than the prosecutor's statement to defense counsel. Because the prosecutor's statement was clearly improper, we must further consider whether it was prejudicial.

> b. Does the "Harlem" comment demonstrate prejudice entitling Gentry to relief on this personal restraint petition?

Initially, it must be observed that Prosecutor Clem's "Harlem" comment, while extremely offensive, does not present the same sort of prejudice to fair trial

rights as evident in *Monday*.[14] The comment was made outside of the jury's presence, and in no way affected the presentation the jury heard. Thus, the conduct was not an intentional appeal to racial bias that could have "undermine[d] the defendant's credibility or the presumption of innocence" and affected the jury's verdict. *Monday*, 171 Wn.2d at 680. As far as its impact on Gentry's trial is concerned, therefore, we conclude that the comment did not result in actual and substantial prejudice to Gentry.

Departing from the analysis in *Monday*, Gentry appears to argue that we must consider whether the cumulative effect of all instances of race-based conduct, in concert with the racially charged nature of the crime and the absence at trial of persons of color other than Gentry and his counsel, constitute prosecutorial misconduct. But the hearings following the motion to disqualify Clem after his remark to Robinson fully explored whether there was racial bias tainting the proceedings against Gentry. Judge Strombom noted in her oral ruling that the "testimony [on the motion to disqualify] is quite clear, and is uncontradicted, that no discretionary decision has been made because of a racial bias or motivation." Suppl. VRP at 429 (Decl. of Timothy K. Ford, Ex. 16). "All of the evidence presented suggests there is no indication or hint that anything was done in this case that was done for a racially biased purpose." *Id.* at 430. Judge Strombom's conclusions, made after a searching inquiry into serious allegations of unethical

---

[14] Amici curiae ACLU argue that in a capital case, this court should hold that a finding of race-based prosecutorial misconduct should result in automatic reversal. Br. of ACLU at 5. No party has advanced this argument and we decline to consider it.

behavior, assure us that Gentry did not suffer the sort of prejudice that we confronted in *Monday*.

Finally, Gentry argues that the evidence against him was thin at best, so thin that racial bias had to have motivated the conviction. Likewise, he claims the evidence of the aggravators that made him death-eligible was so thin that racial bias must have contributed to that jury finding. But unless the prosecution team appealed to racial bias, which has not been shown, an argument about the sufficiency of the evidence is not related to prosecutorial misconduct but is more akin to arguments already made and rejected on direct appeal. *See Gentry*, 125 Wn.2d at 585 (challenging the science matching the blood on Gentry's shoes to Holden's type).

Applying the *Monday* standard, we conclude that the "Harlem" remark does not rise to the level of reversible prosecutorial misconduct. The remark was harmless beyond a reasonable doubt because the jury did not know of it and thus it could have had no effect on the jury's verdict. In this personal restraint context, the result is that Gentry cannot demonstrate actual and substantial prejudice to support his claim for relief.

## CONCLUSION

Gentry cannot receive the benefit of the new rule announced in *Monday*. The burden-shifting rule announced in *Monday* is not retroactive under *Teague*, and we decline in this case to apply a different retroactivity analysis. Even when this case is viewed through the lens of *Monday*, Gentry cannot demonstrate

prejudice. The one clear instance of race-based improper conduct on the part of the prosecution occurred outside the knowledge of the jury and could not have affected the outcome at trial. Recognizing the limited nature of the court's collateral review, we dismiss Gentry's personal restraint petition.

*In re Pers. Restraint of Jonathan L. Gentry,* 86585-0

-29-

_____

WE CONCUR:

Madsen, C.J.

_____

_____

_____

Worswick, J.P.T.

Fairhurst, J.

Verellen, J.P.T.

No. 86585-0

WIGGINS, J. (dissenting in part) – Jonathan Lee Gentry filed a motion to remand for supplementation of the record or a reference hearing in light of our decision in *State v. Davis*, 175 Wn.2d 287, 290 P.3d 43 (2012). I believe a reference hearing is necessary to examine pertinent statistics that would enable us to assess whether Washington's death penalty is imposed in a racially discriminatory manner. Because the majority declines to grant a reference hearing, I dissent. In all other respects, I agree with the majority.

We are required to conduct proportionality review in every capital case. RCW 10.95.130(2)(b). The inquiry we engage in is whether the death penalty is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *Id.* One of the primary goals of proportionality review is to ensure that the death penalty is not imposed disproportionately on the basis of race. *State v. Cross*, 156 Wn.2d, 580, 630, 132 P.3d 80 (2006); *State v. Elledge*, 144 Wn.2d 62, 80, 26 P.3d 271 (2001); *State v. Gentry*, 125 Wn.2d 570, 655, 888 P.2d 1105 (1995). Since Gentry's sentencing, new data has developed concerning race and the imposition of the death penalty in Washington. This data merits a new proportionality review.

Only one other African American had received the death penalty when Gentry was sentenced. In that case, the victim and defendant were of the same race and ethnicity. Since Gentry's sentencing, five additional African American men have been sentenced similarly (Sammie Luvene, Dwayne Woods, Cecil Davis, Covell Thomas, and Allen Gregory). Of the seven African American men sentenced to death, six received the death penalty for killing a person of a different race.[1] This statistic hints that race impacts the imposition of the death penalty and illustrates the need for a new proportionality review.

In *Davis*, I urged the court to conduct an evidentiary hearing on similar grounds. 175 Wn.2d at 389 (Wiggins, J., concurring in dissent). The majority there felt "constrained to note that the issue was not raised by the defendant." *Id.* at 362. In contrast to *Davis*, Gentry specifically requests a reference hearing to determine "whether [racial] disparities are statistically significant." Mot. to Set Oral Arg. or to Remand for Supplementation of the R. or a Reference Hr'g in Light of *State v. Davis*, 175 Wn.2d 287, 290 P.3d 43 (Sept. 20, 2012) at 6. Thus, we do not face the constraints the majority felt in *Davis*. This court should accordingly take this opportunity to remand Gentry's petition for an evidentiary hearing to determine whether, statistically speaking, the imposition of Washington's death penalty is skewed on the impermissible basis of race. The cost of any burden on the court system associated with conducting this reference hearing is negligible compared to the assurance that Washington fairly and proportionately imposes the death penalty.

---

[1] Only Caucasians (one of which is categorized as Caucasian-Native American) have received the death penalty for killing someone of the same race since Gentry was sentenced.

2

I dissent in part.

_Wiggins, J._