# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) ) ) | No. 92421-0 |
| BOBBY DARRELL COLBERT, | ) ) | En Banc |
| Petitioner. | ) ) ) | Filed    SEP 29 2016 |

JOHNSON, J.—In this personal restraint petition (PRP), the petitioner challenges his 2005 conviction for second degree rape, arguing our decision in *State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014)—which held that instructing the jury that the defendant bears the burden to establish the victim's consent was error—should apply retroactively. He presents two main arguments: that his PRP overcomes the one-year time limit under chapter 10.73 RCW because the decision in *W.R.* either involved statutory interpretation exempt from the time bar or is a significant change in the law material to his conviction that requires retroactive application. We hold that *W.R.* does not apply retroactively and deny the petition as time barred.

This is Bobby Colbert's third PRP. Colbert was tried on January 31, 2005, for rape in the third degree and rape in the second degree involving two different

victims on two different dates. A jury convicted Colbert on both counts. Colbert received an indeterminate sentence of 136 months to life on March 31, 2005, for the second degree rape conviction.[1]

At Colbert's trial, the court instructed the jury that Colbert had the burden of proving consent as to the second degree rape charge. While Colbert's counsel acknowledged that the proposed instruction was consistent with then-existing case law as set forth in *State v. Camara*, 113 Wn.2d 631, 781 P.2d 483 (1989), *overruled by W.R.*, 181 Wn.2d 757, and proposed an instruction similar to the one given there,[2] counsel expressed concern that the instruction would cause confusion about the burdens as to consent. The court overruled the objection[3] and instructed the jury:

> Consent is a defense to a charge of rape in the second degree. This defense must be established by a preponderance of the evidence. Preponderance of the evidence means that you must be persuaded, considering all the evidence in the case, that it is more probably true than not true. If you find that the defendant has established this defense, it will be your duty to return a verdict of not guilty.

---

[1] The second degree rape charge—involving victim K.P.—is the only one at issue in this petition.

[2] Before the rule discussed below, *Camara* held the burden of proof on consent in rape prosecution lies with the defendant.

[3] The court noted that the defense had the benefit of any evidence, regardless of which party presented it.

2

Pers. Restraint Pet. Ex. 1 (Instr. 15). In *W.R.*, we held giving this instruction is error.

Colbert filed this third PRP in this court on December 26, 2013. The petition was originally based on *State v. Lynch*, 178 Wn.2d 487, 309 P.3d 482 (2013), which involved the Sixth Amendment to the United States Constitution's right to control one's defense. We transferred the PRP to the Court of Appeals. The Court of Appeals then certified Colbert's PRP to this court after *W.R.* was decided.

Colbert alleges that he is unlawfully restrained because there has been a significant change in the law that is material to his conviction. RAP 16.4(c)(4).[4] He argues that the trial court violated his due process rights by requiring him to prove consent by a preponderance of the evidence, contrary to the holding of *W.R.*

The question here is whether the petition is timely. Because Colbert's case became final on June 8, 2007, when the appellate mandate issued, he is outside the one-year period for collaterally attacking a conviction unless an exception applies. RCW 10.73.090.

---

[4] "The restraint must be unlawful for one or more of the following reasons:
" . . . .
"(4) There has been significant change in the law, whether substantive or procedural, which is material to the conviction, sentence, or other order entered in a criminal proceeding or civil proceeding instituted by the state or local government, and sufficient reasons exist to require retroactive application of the changed legal standard."

Colbert first argues that his petition is not subject to the one-year time bar of RCW 10.73.090 because his claims are based on a "significant change in the law," an exception to the one-year limitation under RCW 10.73.100(6), which provides:

> The time limit specified in RCW 10.73.090 does not apply to a petition or motion that is based solely on one or more of the following grounds:
>
> ....
>
> (6) There has been a significant change in the law, whether substantive or procedural, which is material to the conviction, sentence, or other order entered in a criminal or civil proceeding instituted by the state or local government, and either the legislature has expressly provided that the change in the law is to be applied retroactively, or a court, in interpreting a change in the law that lacks express legislative intent regarding retroactive application, determines that sufficient reasons exist to require retroactive application of the changed legal standard.

Colbert claims that *W.R.* significantly changed the law regarding the burden of proof of consent in a second degree rape case.

RCW 10.73.100(6) sets forth three conditions that must be met before a petitioner can overcome the one-year time bar: (1) a substantial change in the law (2) that is material and (3) that applies retroactively. Colbert is correct that *W.R.* constitutes a significant change in the law, material to his conviction. A "significant change in the law" occurs when "'an intervening opinion has effectively overturned a prior appellate decision that was originally determinative of a material issue.'" *In re Pers. Restraint of Domingo*, 155 Wn.2d 356, 366, 119 P.3d 816 (2005) (quoting *In re Pers. Restraint of Greening*, 141 Wn.2d 687, 697, 9

4

P.3d 206 (2000)). The State does not disagree that *W.R.* constitutes a substantial change in the law that is material to Colbert's conviction. *See* Suppl. Br. of Resp't at 15 (acknowledging that *W.R.* constitutes a "significant change of the law" within the meaning of RCW 10.73.100(6)). However, determining whether a decision is a change in the law is an inquiry distinct from determining whether it is applied retroactively.

Colbert first contends that retroactive application is warranted because the *W.R.* opinion does not create a "new rule" because it is based on interpretation of a 1975 statute. Suppl. Br. of Pet'r at 8-9. While Colbert is correct that "where a statute has been construed by the highest court of the state, the court's construction is deemed to be what the statute has meant since its enactment. In other words, there is no question of retroactivity." *State v. Moen*, 129 Wn.2d 535, 538, 919 P.2d 69 (1996); *see also In re Pers. Restraint of Vandervlugt*, 120 Wn.2d 427, 842 P.2d 950 (1992); *In re Pers. Restraint of Moore*, 116 Wn.2d 30, 803 P.2d 300 (1991) (holding when this court interprets a statute, that statute is deemed to have had that newly interpreted meaning since that statute was enacted). We disagree that *W.R.* involved statutory interpretation.[5]

---

[5] Even if *W.R.* was grounded in statutory interpretation, and it was not, it would have overruled a previous interpretation of the rape statute. In other words, it was a *reinterpretation* of the statute, and the principle that the court's construction is deemed to be what the statute has meant since its enactment does not logically appear to apply. No cases have been cited or found where a decision overrules prior cases involving statutory interpretation subject to this rule.

*W.R.* expressly overruled *Camara* and *State v. Gregory*, 158 Wn.2d 759, 147 P.3d 1201 (2006),[6] on due process grounds and was not based on statutory interpretation. WASH. CONST. art. I, § 12. We know that because the *W.R.* opinion itself holds that is a violation of due process to task the defendant with proving a defense that negates an element of the crime charged. The decision did not turn on any statutory language. The misallocation of the burden addressed in *W.R.* has only a tangential relationship to the second degree rape statute insofar as consent can negate an element of the offense. The statutory language of rape in the second degree does not mention consent or contain any provisions relating to affirmative defense.[7] Unlike rape in the third degree, consent is not an element of rape in the second degree. As was explained in *Lynch*:

---

Whether the interpretation applies from enactment or from the date of the case "reinterpreting" a statute is an interesting issue we need not resolve.

[6] *Gregory* reaffirmed the holding in *Camara* that the defendant must prove consent by a preponderance of the evidence.

[7] Rape in the second degree:
"(1) A person is guilty of rape in the second degree when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person:
"(a) By forcible compulsion." RCW 9A.44.050.
Rape in the third degree:
"(1) A person is guilty of rape in the third degree when, under circumstances not constituting rape in the first or second degrees, such person engages in sexual intercourse with another person:
"(a) *Where the victim did not consent as defined in* RCW 9A.44.010(7), to sexual intercourse with the perpetrator and such lack of consent was clearly expressed by the victim's words or conduct, or

> Rape in the second degree encompasses sexual intercourse by forcible compulsion "under circumstances not constituting rape in the first degree," sexual intercourse with a victim who is physically helpless or mentally incapacitated, and sexual intercourse characterized by the victim's vulnerability and dependence on the perpetrator for certain care or services. Rape in the third degree encompasses sexual intercourse "under circumstances not constituting rape in the first or second degrees," where the victim clearly expressed a lack of consent or the perpetrator made a "threat of substantial unlawful harm" to the victim's "property rights."

*Lynch*, 178 Wn.2d at 515 (Gordon McCloud, J., concurring) (footnotes omitted) (quoting RCW 9A.44.050(1)(a), .060(1)(b)). Since second degree rape requires proof of forcible compulsion and not lack of consent, the reasoning in *W.R.* did not turn on statutory interpretation, even though, in some cases, consent negates the element of forcible compulsion. The holding of *W.R.* makes this point expressly.

Nonetheless, Colbert cites two cases in support of his argument that *W.R.* is based on statutory interpretation, *In re Personal Restraint of Grasso*, 151 Wn.2d 1, 84 P.3d 859 (2004) (plurality opinion), and *In re Personal Restraint of Yung-Cheng Tsai*, 183 Wn.2d 91, 351 P.3d 138 (2015). *Grasso* dealt with the admission of a child victim's hearsay statements in a child molestation case. In a three-justice lead opinion, *Grasso* held that the meaning of "testify" as used in RCW 9A.44.120(2)(a) and redefined in *State v. Rohrich*, 132 Wn.2d 472, 939 P.2d 697 (1997), must be applied retroactively because it was based on statutory

---

"(b) Where there is threat of substantial unlawful harm to property rights of the victim." RCW 9A.44.060 (emphasis added).

7

interpretation and thus not a "new rule" warranting *Teague* retroactivity analysis. *Teague v. Lane*, 489 U.S. 288, 299, 311, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989) (plurality opinion). However, *Grasso* is inapposite to *W.R.*

In *Grasso*, we decided retroactive application was appropriate for two reasons: first, because the rule announced in *Rohrich* was based on statutory construction of the word "testifies," the court's construction was deemed to be what the statute has meant since its enactment. In other words, there was no question of retroactivity. Unlike *Grasso*, as pointed out above, *W.R.* is based on constitutional due process principles rather than statutory interpretation. Second, and more importantly, Grasso was procedurally situated differently and not facing the same time bar that Colbert now faces. To the extent that *Rohrich* was based on constitutional principles similar to *W.R.*, the *Rohrich* decision was filed before Grasso's direct review was final. *See Grasso*, 151 Wn.2d at 12 ("'[a] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, *pending on direct review or not yet final.*' . . . Because we consider the date of the mandate to be the date of finality in this case, the *Rohrich* decision occurred before Grasso's direct review was final." (alteration in original) (quoting *In re Pers. Restraint of St. Pierre*, 118 Wn.2d 321, 326, 823 P.2d 492 (1992)). In the present case, since the *W.R.* decision occurred several years after the mandate issued, it is not controlling.

Next, Colbert argues that *Tsai* supports his position that *W.R.* warrants retroactive application. In *Tsai*, we granted collateral relief involving a claim of ineffective assistance of counsel regarding the advisement of immigration consequences of a conviction. The ineffective assistance claim was based on the statutory requirements of RCW 10.40.200, which in certain cases deals with deportation upon conviction. We held that *Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010), did not announce a new rule under Washington law for *Teague* purposes because RCW 10.40.200, adopted in 1983, had always required a defendant to be advised by counsel of immigration consequences, which *Padilla* ultimately recognized. We held that *Padilla* warranted retroactive application as a significant, material, and retroactive application of statutory requirements exempting the PRP from the one-year time bar, but was not a new rule subject to *Teague* analysis. Because *W.R.* is not statutorily based, *Tsai* is not controlling here.

Even where a case does not involve statutory interpretation, it may in limited circumstances be retroactive under narrow exceptions recognized in *Teague*. In determining whether an exception applies, we typically first determine whether the rule is a new rule subject to *Teague* analysis. Generally, RCW 10.73.100(6) is interpreted consistent with the federal retroactivity analysis under *Teague. See In re Pers. Restraint of Gentry*, 179 Wn.2d 614, 625, 316 P.3d 1020 (2014). Under

9

that analysis, a "new rule" will not be given retroactive application to cases on collateral review. *St. Pierre*, 118 Wn.2d at 326 (citing *Teague*, 489 U.S. at 311). A new rule is defined as one that breaks new ground or "'was not dictated by precedent existing at the time the defendant's conviction became final.' Moreover, if 'reasonable jurists could disagree on the rule of law, the rule is new.'" *In re Pers. Restraint of Haghighi*, 178 Wn.2d 435, 443, 309 P.3d 459 (2013) (emphasis and citation omitted) (quoting *In re Pers. Restraint of Eastmond*, 173 Wn.2d 632, 639-40, 272 P.3d 188 (2012)). *W.R.* is such a "new rule." The change in who bears the burden of proving consent in a second degree rape case was not dictated by precedent. *W.R.* expressly overruled our prior cases, which had established the contrary rule. *W.R.* explicitly noted *Camara* and *Gregory* had "become incorrect" because "subsequent United States Supreme Court precedent clarifie[d] that our prior understanding was erroneous." *W.R.*, 181 Wn.2d at 768. As a new rule, we thus turn to the *Teague* framework to determine if the change in who bears the burden of proving consent in a second degree rape case warrants retroactivity.

Under the *Teague* analysis, a new rule warrants retroactive application under two circumstances: "It must either be a substantive rule that places certain behavior 'beyond the power of the criminal law-making authority to proscribe' or a watershed rule of criminal procedure 'implicit in the concept of ordered liberty.'"

*Gentry*, 179 Wn.2d at 628 (internal quotation marks omitted) (quoting *Teague*, 489

U.S. at 311). We have recognized that

> *Teague* presents a very high hurdle to overcome. In announcing
> watershed rules, courts have been sparing to the point of
> unwillingness. *See In re Pers. Restraint of Markel*, 154 Wn.2d 262,
> 269 n.2, 111 P.3d 249 (2005) (noting that in review of 11 claimed
> watershed rules, the United States Supreme Court had yet to declare
> any a watershed rule triggering retroactivity). The United States
> Supreme Court has cited the rule announced in *Gideon v. Wainwright*,
> [372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963)] guaranteeing the
> right to counsel for criminal defendants, as an example of a watershed
> rule of criminal procedure, though the decision in *Gideon* predated
> *Teague* by several years. *Saffle v. Parks*, 494 U.S. 484, 495, 110 S. Ct.
> 1257, 108 L. Ed. 2d 415 (1990). But the United States Supreme Court
> has stopped short of recognizing any other instance of the type of rule
> it discussed in *Teague*. Likewise, we have yet to announce such a rule,
> though we have several times concluded a rule does not meet the
> *Teague* requirements. *See Markel*, 154 Wn.2d at 273 (holding the rule
> announced in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354,
> 158 L. Ed. 2d 177 (2004), is not a watershed rule of criminal
> procedure); *State v. Evans*, 154 Wn.2d 438, 447-48, 114 P.3d 627
> (2005) (same with regard to *Apprendi* [*v. New* Jersey, 530 U.S. 466,
> 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)] and *Blakely* [*v.*
> *Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004)]
> rules).

*Gentry*, 179 Wn.2d at 628-29 (footnotes omitted).

Colbert argues that if the rule from *W.R.* regarding the burden of proof of

consent is a new rule, it must be applied retroactively under a *Teague* exception.

The first *Teague* exception—generally involving substantive rules that place

certain behavior beyond the power of the criminal-law-making authority to

proscribe—we conclude does not apply because that exception involves a rule that

either decriminalizes a class of private conduct or prohibits the imposition of capital punishment on a particular class of persons. *Saffle*, 494 U.S. at 495 (holding *Teague* exceptions not met based on *Gideon*, 372 U.S.335).

The second *Teague* exception, involving "watershed" procedural rules, is limited to new procedures considered essential for an accurate conviction. *Teague*, 489 U.S. at 313. As Colbert acknowledges, courts are reluctant to declare rules "watershed." Suppl. Br. of Pet'r at 20-21. In this context, to qualify as a new watershed rule, the rule must be necessary to prevent "an impermissibly large risk" of inaccurate convictions and must "'alter our understanding of the bedrock procedural elements'" essential to the fairness of a proceeding. *Teague*, 489 U.S. at 312, 311 (emphasis omitted) (quoting *Mackey v. United States*, 401 U.S. 667, 693, 91 S. Ct. 1160, 28 L. Ed. 2d 404 (1971)). This second *Teague* exception is very narrow. The Court of Appeals has correctly recognized this:

> The Court has repeatedly emphasized the limited scope of the second *Teague* exception. *O'Dell v. Netherland*, 521 U.S. 151, 157, 117 S. Ct. 1969, 138 L. Ed. 2d 351 (1997) (citing *Graham v. Collins*, 506 U.S. 461, 478, 113 S. Ct. 892, 122 L. Ed. 2d 260 (1993)). Because any rule "'would be so central to an accurate determination of innocence or guilt [that it is] unlikely that many such components of basic due process have yet to emerge,'" the Supreme Court has yet to find a new rule that falls under the second *Teague* exception. *Graham*, 506 U.S. at 478 (quoting *Teague*, 489 U.S. at 313). "'[T]his class of rules is extremely narrow, and it is unlikely that any . . . ha[s] yet to emerge.'" *Markel*, 154 Wn.2d at 269 (quoting *Schriro*[8]).

---

[8] *Schriro v. Summerlin*, 542 U.S. 348, 352, 124 S. Ct. 2519, 159 L. Ed. 2d 442 (2004).

*State v. Carney*, 178 Wn. App. 349, 362, 314 P.3d 736 (2013) (most alterations in original) (footnote omitted). We agree.

Colbert cites to a footnote in *Hall v. Kelso*, 892 F.2d 1541 (11th Cir. 1990) to support his argument that found retroactivity applicable under the "watershed" exception. There, the court held a jury instruction was an improper burden shift under *Sandstrom v. Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979), and warranted retroactive application. While *Hall* found retroactive application under the watershed rule of *Teague* warranted,[9] other federal courts considering the same issue involved in *Hall* have disagreed that *Sandstrom* created a watershed rule. *See Johnson v. McKune*, 288 F.3d 1187, 1200 (10th Cir. 2002); *Cain v. Redman*, 947 F.2d 817, 822 (6th Cir. 1991). The United States Supreme Court has not held that *Sandstrom* created a watershed rule.

Moreover, *Hall* dealt with a felony murder case where the instruction was held to be impermissible because it relieved the State altogether of the burden of proving that the defendant had the requisite criminal intent for the underlying crime. Because the State here was required to prove that forcible compulsion occurred and all other elements of the offense, the risk of an inaccurate conviction does not exist. The jury necessarily found the State proved forcible compulsion.

---

[9] *Hall*, 892 F.2d at 1543 n.1. The *Hall* opinion included its retroactivity analysis in a footnote, which we find unpersuasive.

13

We hold that Colbert's petition is beyond the time limits of RCW 10.73.090 and fails to meet the time bar exception set out in RCW 10.73.100(6).[10] We deny Colbert's petition.

WE CONCUR:

---

[10] Because we determine that the decision in *W.R.* announced a new rule not given retroactive application and dismiss Colbert's petition as time barred, we need not reach the two questions of (1) whether Colbert was actually and substantially prejudiced by the change in burden of proof of consent and (2) whether Colbert invited error by seeking a jury instruction similar to the one proposed by the State and submitted to the jury.

*In re Pers. Restraint of Colbert (Bobby D.)*

No. 92421-0

MADSEN, C.J. (concurring)—Both the majority and concurrence/dissent agree
that our recent decision in *State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014),
constitutes a significant change in the law for purposes of RCW 10.73.100(6). I agree
with the majority that *W.R.* rests on constitutional due process principles rather than
statutory interpretation. WASH. CONST. art. I, § 12. Also, I agree with the
concurrence/dissent that the *Teague* retroactivity rule, relied on by the majority, applies
only to a new rule of constitutional law. *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060,
103 L. Ed. 334 (1989) (plurality opinion).

But the question here is whether there is sufficient reason to require retroactive
application of a significant change in the law under RCW 10.73.100, which creates an
exception to the time bar under RCW 10.73.090. *See* RCW 10.73.100(6) (the time limit
in RCW 10.73.100 does not apply if "[t]here has been a significant change in the law, . . .
which is material to the conviction," if a "court . . . determines that sufficient reasons
exist to require retroactive application of the changed legal standard"). In *In re Personal
Restraint of Yung-Cheng Tsai*, 183 Wn.2d 91, 105, 351 P.3d 138 (2015), this court held
that a "significant change" in state law and a "new" constitutional rule of criminal

procedure under *Teague* have different meanings and serve different purposes. However, just as *Tsai* held there is a difference between "a significant change" in state law and retroactivity considerations under *Teague*, I would hold that retroactivity under RCW 10.73.090, which provides for exceptions to the time bar for personal restraint petitions, also has a distinct meaning and serves a distinct purpose from "a significant change in the law." The mere fact that there is a significant change in the law cannot signal that the change necessarily will be applied retroactively because the statute provides discretion to the court to make that decision.

RCW 10.73.100(6) requires the court to decide whether "sufficient reasons exist to require retroactive application of the changed legal standard." The fact that there has been a significant change in state law does not automatically mean there is reason to apply that change to cases that are final. This court has been inconsistent about what standard to apply when there is a significant change in the law. *See Tsai*, 183 Wn.2d 91; *In re Pers. Restraint of Markel*, 154 Wn.2d 262, 111 P.3d 249 (2005); *In re Pers. Restraint of St. Pierre*, 118 Wn.2d 321, 823 P.2d 492 (1992).

I am not prepared to resolve the issue here but I agree with the concurrence/dissent that even if the court found an exception to the time bar, the petitioner has failed to show he was actually and substantially prejudiced by the instructional error in this case. Therefore, I would deny his petition.

No. 92421-0
Madsen, C.J., concurring

_Madsen, C.J._

*In re Pers. Restraint of Colbert (Bobby Darrell)*, No. 92421-0
(Gordon McCloud, J., dissenting in part and concurring in part)

No. 92421-0

GORDON McCLOUD, J. (dissenting in part and concurring in part)—The

presumption of nonretroactivity adopted by the United States Supreme Court in

*Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989) (plurality

opinion), and subsequently by this court,[1] applies only to *new* rules of *constitutional*

law.[2] If the holding in *State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014), were

such a rule, then I would agree with the majority that it applied only prospectively

because it meets neither of *Teague*'s exceptions to presumptive nonretroactivity:

---

[1] *In re Pers. Restraint of St. Pierre*, 118 Wn.2d 321, 325-26, 330, 823 P.2d 492 (1992).

[2] *Teague*, 489 U.S. at 310 ("Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced."); *Danforth v. Minnesota*, 552 U.S. 264, 266, 128 S. Ct. 1029, 169 L. Ed. 2d 859 (2008) ("New constitutional rules announced by this Court that place certain kinds of primary individual conduct beyond the power of the States to proscribe, as well as 'watershed' rules of criminal procedure, must be applied in all future trials, all cases pending on direct review, and all federal habeas corpus proceedings.").

1

*W.R.* did not announce a substantive rule of law under *Teague*,[3] and it does not meet

*Teague*'s strict definition of a "watershed rule."[4]

But the holding in *W.R.* is not the kind of rule that triggers *Teague*'s

presumption, for two reasons. First, *W.R.* rests in part on *statutory* as opposed to

constitutional interpretation and *Teague* is "inapplicable to the situation in which

[the] Court decides the meaning of a criminal statute,"[5] *Bousley v. United States*, 523

U.S. 614, 620, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998). This is because a statute

---

[3] *Cf. Montgomery v. Louisiana*, __U.S.__, 136 S. Ct. 718, 732-34, 193 L. Ed. 2d 599 (2016) (*Miller v. Alabama*, 567 U.S. __, 132 S. Ct. 2455, 2460, 183 L. Ed. 2d 407 (2012) prohibition on mandatory life without parole for juvenile offenders announced a new substantive rule under *Teague*).

[4] Federal cases generally hold that a burden-shifting error triggers the second *Teague* exception (for watershed new rules) only if it is a structural error. *E.g.*, *United States v. Sanders*, 247 F.3d 139, 148-49 (4th Cir. 2001) (distinguishing rule adopted in *Sullivan v. Louisiana*, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993), which applies retroactively under *Teague*, from rule adopted in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), which does not, on the ground that *Apprendi* errors may be found harmless); *Humphrey v. Cain*, 120 F.3d 526, 529 (5th Cir. 1997) (*Sullivan* rule applies retroactively because a structural error makes verdict fundamentally unreliable), *vacated in part on other grounds on reh'g*, 138 F.3d 552, 553 (5th Cir. 1998) (en banc); *Harmon v. Marshall*, 69 F.3d 963, 967 (9th Cir. 1995); *Adams v. Aiken*, 41 F.3d 175, 178-79 (4th Cir. 1994). And the error recognized in *W.R.*, 181 Wn.2d 757 is not structural.

[5] This is because a holding on legislative intent always applies retroactively: "A judicial construction of a statute is an authoritative statement of what the statute meant *before* as well as after the decision giving rise to that construction." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 312-13, 114 S. Ct. 1510, 128 L. Ed. 2d 274 (1994) (emphasis added).

2

means what it means—that is, it means what the legislature intended—on enactment.[6] This court has long observed that rule.[7] Second, to the extent that *W.R.* rested on constitutional principles, it did not announce a "new" rule under *Teague*.

For these reasons, I would hold that the rule announced in *W.R.* applies to cases that became final before *W.R.* was issued and, hence, Bobby Colbert can overcome the one-year time bar to collateral relief. *See* majority at 4 (citing RCW 10.73.100(6)). His claim of jury instructional error should therefore be considered on the merits. On the merits, Colbert has failed to prove that the instructional error caused actual and substantial prejudice. I therefore concur in the majority's decision to deny relief.

---

[6] *In re Pers. Restraint of Johnson*, 131 Wn.2d 558, 568, 933 P.2d 1019 (1997).

[7] *In re Pers. Restraint of Hinton*, 152 Wn.2d 853, 859-60 & n.2, 100 P.3d 801 (2004) (retroactively applying statutory interpretation announced in *In re Personal Restraint of Andress*, 147 Wn.2d 602, 608-09, 56 P.3d 981 (2002), because "*Andress* determined what the statute had meant since 1976"); *Johnson*, 131 Wn.2d at 568 (retroactively applying statutory interpretation announced in *In re Personal Restraint of Sietz*, 124 Wn.2d 645, 650-52, 880 P.2d 34 (1994), because "[o]nce the Court has determined the meaning of a statute, that is what the statute has meant since its enactment"); *State v. Moen*, 129 Wn.2d 535, 538-39, 919 P.2d 69 (1996) (retroactively applying statutory interpretation announced in *State v. Krall*, 125 Wn.2d 146, 881 P.2d 1040 (1994), because "where a statute has been construed by the highest court of the state, the court's construction is deemed to be what the statute has meant since its enactment"); *In re Pers. Restraint of Moore*, 116 Wn.2d 30, 38, 803 P.2d 300 (1991) (holding on legislative intent "relates back to the enactment of that legislation").

I. THE MAJORITY ERRS BY APPLYING *TEAGUE*'S PRESUMPTION OF NONRETROACTIVITY TO A HOLDING ON LEGISLATIVE INTENT

The majority acknowledges that *Teague* does not apply to new rules of statutory interpretation: "'[W]here a statute has been construed by the highest court of the state . . . , there is no question of retroactivity.'" Majority at 5 (quoting *State v. Moen*, 129 Wn.2d 535, 538, 919 P.2d 69 (1996)). But it concludes that *Teague* applies to the rule announced in *W.R.* for two reasons: (1) *W.R.* "involved [no] statutory interpretation" and (2) even if *W.R.* did involve statutory interpretation, "it was a *reinterpretation*" and thus our case law on automatic retroactivity "does not logically appear to apply." *Id.* at 5 & n.5. I disagree with both of these assertions.

a. *W.R.* contains both a constitutional holding and a holding on legislative intent

The majority is correct that *W.R.* is in large part a constitutional holding. *W.R.* held that this court's decisions in *State v. Camara*, 113 Wn.2d 631, 639-40, 781 P.2d 483 (1989), and *State v. Gregory*, 158 Wn.2d 759, 801-04, 147 P.3d 1201 (2006), which permitted the State to burden the defendant in a first or second degree rape case with proving that the alleged victim consented to sexual contact, violated due process clause protections and must therefore be overruled as incorrect and harmful. 181 Wn.2d at 768-69. We reasoned that *Camara* and *Gregory* both misunderstood

4

the significance of the fact that consent "negates" the forcible compulsion element

of first and second degree rape:

> When we decided *Camara* . . . [w]e [erroneously] interpreted *Martin*
> [*v. Ohio*, 480 U.S. 228, 107 S. Ct. 1098, 94 L. Ed. 2d 267 (1987),] to
> mean that requiring a defendant to prove a defense by a preponderance
> . . . is "not precluded by the fact that the defense 'negates' an element
> of a crime."

*Id.* at 763 (quoting *Camara*, 113 Wn.2d at 640). In recognizing this error, *W.R.* held

that even if the legislature intended to burden the defendant in a first or second

degree rape case with proving consent (i.e., with negating forcible compulsion), due

process clause protections would prohibit the legislature from doing so. 181 Wn.2d

at 766-67 ("The defendant cannot be burdened with proving consent by a

preponderance of the evidence, as the burden must remain on the State to prove

forcible compulsion beyond reasonable doubt.").

If this were the only holding in *W.R.*, I would agree with the majority's

assertion that the case "involved [no] statutory interpretation" for purposes of our

rules on retroactivity. Majority at 5. But *W.R.* also clearly contains a holding on

legislative intent. Responding to the dissent's contrary argument, the *W.R.* majority

explains at length that overturning *Gregory* and *Camara* "is *consistent* with rape

reform laws" in 1975 because those reforms were never intended to burden the

defendant with proving consent:

5

> The dissent complains that our decision reverses the progress made in shifting the focus of rape prosecutions away from the victim's conduct and onto the defendant's. It does not. As Professor Loh explained in a leading law review article discussed in *Camara*, the new law "focuses more on the actor's use or threat of force rather than the victim's conduct as the external criterion of nonconsent[,]" [but] Washington and "[m]odern statutory and decisional law do not treat force and nonconsent as separate formal elements." Rather, force is an objective indicator of nonconsent. . . . [Therefore], the [rape reform laws'] shift in focus to "forcible compulsion" was "more a refinement that a reformulation." It *remains* that a person is not guilty of rape if the sexual intercourse is consensual.

*W.R.*, 181 Wn.2d at 767 (emphasis added) (citation omitted) (third alteration in original) (quoting Wallace D. Loh, *The Impact of Common Law and Rape Reform Statutes on Prosecution: An Empirical Study*, 55 WASH. L. REV. 543, 550, 552 n.43 (1980); *Camara*, 113 Wn.2d at 637 n.3).

Indeed, the *W.R.* dissent does not address the majority's constitutional holding *at all*. It makes no attempt to explain how consent and forcible compulsion could coexist (not negate one another); thus, it makes no attempt to argue that Washington's second degree rape statute would satisfy due process even if it did require a defendant to prove consent. *W.R.*, 181 Wn.2d at 771-74 (Owens, J., dissenting). Instead, the *W.R.* dissent argues only that Washington's 1975 legislature *intended* to make the accuser's consent an affirmative defense to first or second degree rape and defends that policy decision as tending to reduce societal victim-blaming. *Id.* Had the *W.R.* majority rested its holding on constitutional principles

alone, it would not have needed to rebut the dissent's statutory interpretation. It would have sufficed to point out that no matter how badly the legislature *wanted* to burden rape defendants with proving consent, the constitution prohibits it. *See id.* at 763-65 ("*Burdening a Defendant with Proving a Defense That Negates an Element of the Crime Charged Violates Due Process*").

But the *W.R.* majority goes further than that: it clearly rejects *both* *Camara/Gregory*'s constitutional holding *and* the dissent's statutory interpretation. Thus, *W.R.* contains both a constitutional holding and a holding on the legislative intent embodied in the 1975 rape reform laws.

> b. *W.R.*'s statutory holding should apply retrospectively to the time of enactment, even though it overrules a prior decision of this court

After concluding that *W.R.* involved no statutory interpretation, the majority goes on to assert that "[e]ven if *W.R.* was grounded in statutory interpretation," it would not apply retroactively because "it would have overruled a previous interpretation of the rape statute." Majority at 5 n.5. Without explanation, the majority concludes that our precedent holding that statutory interpretations date back to the time of enactment "does not logically appear to apply" when this court reverses its own prior interpretation of a statute. *Id.*

I disagree. When this court interprets a statute, it makes a determination of legislative intent. *See State v. Evans*, 177 Wn.2d 186, 192, 298 P.3d 724 (2013)

7

("The purpose of statutory interpretation is 'to determine and give effect to the intent of the legislature.'" (quoting *State v. Sweany*, 174 Wn.2d 909, 914, 281 P.3d 305 (2012))). And absent any intervening amendment to the statute in question, that prior legislative intent does not change between enactment and judicial interpretation, no matter what happens in between. *See Darkenwald v. Emp't Sec. Dep't*, 183 Wn.2d 237, 252, 350 P.3d 647 (2015). Thus, logic compels us to apply a statutory interpretation retrospectively to the date of enactment of the language being interpreted, even if we must overturn long-standing lower court precedent to do that. *E.g.*, *In re Pers. Restraint of Johnson*, 131 Wn.2d 558, 568, 933 P.2d 1019 (1997) (retroactively applying statutory interpretation, announced in 1994, that overturned Court of Appeals' 1988 interpretation because "[o]nce the Court has determined the meaning of a statute, that is what the statute has meant since its enactment"). There is no reason to depart from this rule[8] just because the erroneous interpretation at issue is our own.

I recognize that *W.R.*'s hybrid statutory-constitutional holding makes this case different from our previous decisions on retroactivity. Those previous decisions all

---

[8] Other than perhaps unwillingness to acknowledge that we also make mistakes. But our mistakes about legislative intent, like lower court mistakes about legislative intent, should be corrected just as completely.

8

fit neatly into one category—either statutory interpretation[9] or constitutional

holding.[10] Because *W.R.* contains both, it presents a retroactivity question of first

impression.[11] But in order to answer that question correctly, we must consider the

---

[9] *E.g.*, *Hinton*, 152 Wn.2d at 859-60 & n.2; *Johnson*, 131 Wn.2d at 567; *Moen*, 129 Wn.2d at 538-39; *In re Pers. Restraint of Vandervlugt*, 120 Wn.2d 427, 432, 842 P.2d 950 (1992); *Moore*, 116 Wn.2d at 38; *State v. Darden*, 99 Wn.2d 675, 678-79, 663 P.2d 1352 (1983).

[10] *E.g.*, *In re Pers. Restraint of Eastmond*, 173 Wn.2d 632, 639-40, 272 P.3d 188 (2012) (applying *Teague* analysis to rule announced in *State v. Williams-Walker*, 167 Wn.2d 889, 897-900, 225 P.3d 913 (2010), that constitutional jury trial right applies to the imposition of a sentence enhancement); *In re Pers. Restraint of Rhome*, 172 Wn.2d 654, 666-67, 260 P.3d 874 (2011) (applying *Teague* analysis to petitioner's proposed due process rule); *State v. Kilgore*, 167 Wn.2d 28, 35, 216 P.3d 393 (2009) (under *Teague* analysis, constitutional rule announced in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), applies only to cases pending on direct review or not yet final); *State v. Abrams*, 163 Wn.2d 277, 290-91, 178 P.3d 1021 (2008) (applying *Teague* analysis to new rule based in constitutional jury trial right); *In re Pers. Restraint of Markel*, 154 Wn.2d 262, 270-71, 111 P.3d 249 (2005) (rule announced in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), does not apply retroactively under *Teague*).

[11] Colbert is correct that our most relevant precedent is *In re Personal Restraint of Grasso*, 151 Wn.2d 1, 84 P.3d 859 (2004) (plurality opinion). That case, like this one, involved the retroactivity (under RCW 10.73.100(6)'s time bar) of a holding with both statutory and constitutional aspects. *Id.* at 11-12 (considering retroactivity of holding in *State v. Rohrich*, 132 Wn.2d 472, 476-81, 939 P.2d 697 (1997), that child hearsay statute required child witness to actually testify since "[t]he Legislature intended the child hearsay statute to be constitutional and 'carefully drafted [it] to avoid any confrontation clause problems'" (quoting Judy Yun, Note, *A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases*, 83 COLUM. L. REV. 1745, 1766 (1983))). But because *Grasso* is a fragmented opinion and presented a different procedural posture—in *Grasso*, the petitioner's case was not final before *Rohrich* was decided—I agree with the majority that it does not control the outcome here. Majority at 7-8; *Grasso*, 151 Wn.2d at 11-12 (lead opinion) (concluding that *Rohrich* had both a statutory and constitutional holding), 21-24 (Madsen, J., concurring) (concluding that *Rohrich* holding was purely statutory), 25-26 (Sanders, J., dissenting) (concluding that *Rohrich* was hybrid holding). I disagree with

logic underlying our precedent on retroactivity. That logic leads to only one conclusion here: *W.R.*'s statutory holding should trigger our time-of-enactment rule, and there should be no question of retroactivity. Simply put, there is no logical reason to hold that this court's long-standing rule—that holdings on legislative intent date back to the time of enactment—drops away when that intent is *bolstered* by a constitutional mandate. Nor is there any logical reason to apply our time-of-enactment rule when this court corrects a lower appellate court's statutory interpretation, but not when we correct our own erroneous interpretation.

II.     TO THE EXTENT THAT *W.R.* IS BASED ON A CONSTITUTIONAL RULE, THAT RULE IS NOT "NEW" UNDER *TEAGUE*

Even if I concluded that *W.R.*'s statutory holding was insufficient, by itself, to trigger our time-of-enactment rule, I would still conclude that *W.R.* applies retrospectively to the statute at issue in this personal restraint petition (PRP). This is because *W.R.* rests on a constitutional rule that was well established in federal case

---

the majority, however, that *Grasso* is distinguishable from this case for any other reason. *See* majority at 8 (asserting that this case implicates a rule of purely constitutional dimensions, whereas *Grasso* implicated statutory interpretation). The lead opinion in *Grasso* specifically distinguished the statutory and constitutional components of the *Rohrich* holding and concluded that the statutory components alone triggered retroactive application under our precedent. *Grasso*, 151 Wn.2d at 12. While this was arguably dicta, given the procedural posture of the case, it is the most relevant discussion our case law contains regarding the retroactive application of a hybrid holding. And it supports retroactivity in this case.

10

law (despite the fact that it was a significant change in state law) before Colbert's conviction became final.

The majority correctly notes that a rule is not new, for purposes of *Teague* retroactivity, if it was dictated by precedent existing when the defendant's conviction became final. Majority at 10; *Beard v. Banks*, 542 U.S. 406, 416, 124 S. Ct. 2504, 159 L. Ed. 2d 494 (2004) (rule is not dictated by precedent, and is therefore "new" under *Teague*, if "reasonable jurists" could differ on this question). But the majority applies this principle incorrectly. It concludes that *W.R.*'s narrow holding—that the State "bears the burden of proving [non]consent in a second degree rape case" in Washington—was not dictated by precedent because *W.R.* "expressly overruled prior cases, which had established the contrary rule," and on this basis concludes that *W.R.* announced a "new" constitutional rule under *Teague*. Majority at 10. This conclusion is wrong for two reasons: it ignores *W.R.*'s broader constitutional holding—that the State may not burden a defendant with disproving an element of the charged crime—and it conflicts with our cases applying RCW 10.73.100(6)— the time bar exception for PRPs based on a significant, material, and retroactively applicable change in the law.

Under our cases applying RCW 10.73.100(6), the fact that *W.R.* expressly overruled prior precedent is significant to Colbert's PRP for only one reason: it

11

shows that *W.R.* was a "significant change" in the law triggering an exception to the time bar. *Id.* at 4-5. But it does not make *W.R.* a "new rule" under *Teague. See In re Pers. Restraint of Yung-Cheng Tsai*, 183 Wn.2d 91, 103-04, 351 P.3d 138 (2015) (explaining that a rule can be a significant change, under RCW 10.73.100(6), without also being a new rule for purposes of *Teague*). The majority errs by conflating these two different questions. When a constitutional holding is dictated by prior *federal* precedent, and yet also overrules or supersedes prior *Washington* precedent, it is a significant change but not a new rule. *Tsai*, 183 Wn.2d at 100, 106-07. The constitutional holding in *W.R.* falls into this category.

*W.R.* relied on two United States Supreme Court decisions, "[r]ead together," for its constitutional holding: *Martin v. Ohio*, 480 U.S. 228, 107 S. Ct. 1098, 94 L. Ed. 2d 267 (1987), and *Smith v. United States*, __ U.S. __, 133 S. Ct. 714, 184 L. Ed. 2d 570 (2013). 181 Wn.2d at 764. *Martin*, which established the "negates analysis" this court applied in *W.R.*, *id.* at 764-65, was decided 20 years before Colbert's conviction became final. And while *Smith* was decided several years after Colbert's conviction became final, it did not alter the relevant part of *Martin*'s due process holding—the negates analysis—at all. On the contrary, *Smith* refers to that analysis as a long-settled, nondebatable constitutional requirement: "The State is foreclosed from shifting the burden of proof to the defendant only 'when an

12

affirmative defense . . . negate[s] an element of the crime[,]' . . . but [not where it] 'does not controvert any of the elements of the offense itself.'" *Smith*, 133 S. Ct. at 719 (quoting *Martin*, 480 U.S. at 237 (Powell, J., dissenting); *Dixon v. United States*, 548 U.S. 1, 6, 126 S. Ct. 2437, 165 L. Ed. 2d 299 (2006)). In other words, the *Smith* decision recites the negates analysis as a *background* rule, not a *new* rule.

*W.R.* recognizes this fact. It refers to *Smith* as "clarifying" that our prior precedent—*Gregory* and *Camara*—was already incorrect under *Martin*. 181 Wn.2d at 763 (explaining that the *Camara* court failed to apply the negates analysis because it misinterpreted *Martin*), 768 ("*Camara* and *Gregory* . . . misapprehend United States Supreme Court precedent and misdescribe the relationship between forcible compulsion and nonconsent . . . [, and] neither case explains how two things can be conceptual opposites without negating one another."); *see also id.* at 764-65 (acknowledging that, *Camara*'s and *Gregory*'s error aside, "[s]ince *Martin*, we have applied the negates analysis to a variety of defenses," including in the rape context). Thus, it finds *Gregory* and *Camara* "incorrect"—the first prerequisite to overruling a prior decision—because they *misconstrued* precedent from 1987 (*Martin*). 181 Wn.2d at 768-69.

*W.R.*'s constitutional holding thus rests on federal precedent that is almost 30 years old—precedent that existed shortly before this court decided *Camara* and long

13

before Colbert's conviction became final. Thus, *W.R.* does not announce a new rule for purposes of *Teague*'s analysis.

The majority offers no clear explanation for its contrary conclusion (other than its erroneous assertion that a holding announces a new rule if it overrules a prior case). Majority at 10. It implicitly endorses the State's argument that because three justices dissented in *W.R.*, *W.R.* announced a rule about which "reasonable jurists could disagree."[12] But as explained above, *W.R.* held that the negates analysis this court rejected in *Camara* was in fact *dictated* by United States Supreme Court precedent from 1987 (*Martin*). 181 Wn.2d at 764-65. Thus, *W.R.* applied a preexisting constitutional rule; it did not announce a new one. Where that occurs, the dictated-by-precedent question is answered, and a prior dissenting opinion—no matter how well written—does not constitute reasonable disagreement for purposes of *Teague*. That is why every federal court of appeals to consider the question has held that the companion holdings in *Missouri v. Frye*, __ U.S. __, 132 S. Ct. 1399,

---

[12] Majority at 10 ("[a] new rule is defined as one that 'breaks new ground or . . . was not *dictated* by precedent existing at the time the defendant's conviction became final' . . . [and] if 'reasonable jurists could disagree on the rule of law, the rule is new'. . . , *W.R.* is such a new rule" (internal quotation marks omitted) (quoting *In re Pers. Restraint of Haghighi*, 178 Wn.2d 435, 443, 309 P.3d 459 (2013))); Suppl. Br. of Resp't on Pers. Restraint Pet. at 16 ("A 'new rule' is one that was not 'dictated by precedent existing at the time the defendant's conviction became final' . . . When reasonable jurists could disagree on the rule of law, the rule is new. . . . The decision in *W.R.* resulted in a three justice dissent. Reasonable jurists did disagree." (quoting *Evans*, 154 Wn.2d at 444)).

182 L. Ed. 2d 379 (2012) and *Lafler v. Cooper*, __ U.S. __, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012), were dictated by the holding in *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and thus did not announce any new rule under *Teague*,[13] even though both *Lafler* and *Frye* were split decisions.[14]

III. THE INSTRUCTIONAL ERROR DID NOT CAUSE ACTUAL AND SUBSTANTIAL PREJUDICE; THUS, COLBERT IS NOT ENTITLED TO RELIEF ON COLLATERAL REVIEW

As the majority recognizes, Colbert's jury received an instruction on consent that violated due process protections. Majority at 2-3 (jury instruction burdening Colbert with proving consent by a preponderance was error under *W.R.*). Because this instruction violated both the statute and the constitution, we apply the prejudice standard applicable to constitutional errors: Colbert is entitled to relief in this collateral proceeding if he can show actual and substantial prejudice. *In re Pers.*

---

[13] *Williams v. United States*, 705 F.3d 293, 294 (8th Cir. 2013) (per curiam); *In re Liddell*, 722 F.3d 737, 738-39 (6th Cir. 2013) (per curiam); *In re Graham*, 714 F.3d 1181, 1182-83 (10th Cir. 2013) (per curiam); *In re King*, 697 F.3d 1189, 1189 (5th Cir. 2012) (per curiam); *In re Perez*, 682 F.3d 930, 932-33 (11th Cir. 2012) (per curiam); *Hare v. United States*, 688 F.3d 878, 879 (7th Cir. 2012); *Buenrostro v. United States*, 697 F.3d 1137, 1140 (9th Cir. 2012).

[14] *Lafler*, 132 S. Ct. at 1391 (Scalia, J., dissenting) (complaining that six-member majority "opens a whole new field of constitutionalized criminal procedure: plea-bargaining law"); *Frye*, 132 S. Ct. at 1414 (Scalia, J., dissenting) (criticizing five-member majority for issuing a holding that is "inconsistent with the Sixth Amendment and decades of our precedent").

*Restraint of Cook*, 114 Wn.2d 802, 810, 792 P.2d 506 (1990) (citing *In re Pers. Restraint of Haverty*, 101 Wn.2d 498, 504, 681 P.2d 835 (1984)). This is a significantly higher burden than Colbert would face on direct appeal, where *the State* would have to prove the error harmless beyond a reasonable doubt. *W.R.*, 181 Wn.2d at 770 (citing *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985)). To demonstrate actual and substantial prejudice, Colbert must demonstrate that "'more likely than not he was prejudiced by the error.'" *In re Pers. Restraint of Brockie*, 178 Wn.2d 532, 539, 309 P.3d 498 (2013) (quoting *In re Pers. Restraint of Hagler*, 97 Wn.2d 818, 826, 650 P.2d 1103 (1982)). Colbert does not meet that burden.

The State offered testimony by seven witnesses: the victim, K.P., and six witnesses who corroborated her account of the rape with testimony about her relationship with Colbert, her demeanor before and after the rape, and/or the events surrounding the rape.

K.P. testified that she went to Colbert's apartment on March 18, 2004, to borrow cigarettes, Verbatim Report of Proceedings (VRP) (Feb. 1, 2005) at 48; that he put his fingers through her belt loops and backed her up against his kitchen sink, *id.* at 69; and that he unbuttoned/unzipped her jeans while she was telling him no, *id.* at 50, 70-71. She testified that he maneuvered her into a position where she was trapped between a kitchen counter and Colbert's refrigerator, and then, standing

16

behind her, pushed her pants down. *Id.* at 73-76. She said that while she was bending down to try to pull up her pants, Colbert held her torso down with his arm and forced his penis into her vagina. *Id.* at 77-78. She testified that he stopped after about a minute and that she then ran to the apartment of her friend Breeanna Loomis and, at some point shortly thereafter, called her recent ex-boyfriend (Justin Olson) and then the police. *Id.* at 79-81; VRP (Feb. 2, 2005) at 140. She testified that she had not seen Colbert socially since the rape, but did see him approaching her house a few days afterward and immediately called the police again. VRP (Feb. 1, 2005) at 82. After the rape occurred, K.P. obtained an antiharassment order against Colbert. VRP (Feb. 2, 2005) at 152-53.

K.P. also testified that Colbert had made unwanted sexual advances toward her about two weeks before the rape: while the two were alone together in her bedroom watching a movie, he "[s]howed [her] his penis and told [her] he just needed one night." VRP (Feb. 1, 2005) at 42. She said that on that occasion she asked him to leave and he did. *Id.* at 43.

On cross-examination, K.P. testified that she did not "struggle" or scream when Colbert raped her because she had learned in a "[r]ape assistance" course that that could make a situation more dangerous. VRP (Feb. 2, 2005) at 131-33. She also admitted that she had a 2001 (juvenile) conviction for felony theft. *Id.* at 144.

17

Loomis testified that K.P. came to her apartment on March 18, 2004, appearing to be in shock, and "dropped to the floor and started crying hysterically." *Id.* at 212. Loomis testified that K.P. told her that Colbert had raped K.P., but was too hysterical to report other details. *Id.* at 213-14. Loomis said that she and K.P. then went to K.P.'s house, where K.P. called the police, and that Loomis then accompanied K.P. to the hospital. *Id.* at 214-15. Loomis described K.P.'s demeanor at the hospital as "[b]lah, just nothing," and said she had never seen K.P. act that way before. *Id.* at 216. She testified that when the two returned to K.P.'s house after the hospital examination, they talked for about an hour and K.P. cried most of that time. *Id.* at 217. She also said that K.P.'s demeanor since that time had been angrier, more hostile toward men, and quieter than before. *Id.* Finally, Loomis testified that she and K.P. were close friends before all of this took place, but were no longer friendly; that the two had not discussed the rape or the trial since March 18, 2004; and that Colbert had denied raping K.P. when Loomis asked him about it. *Id.* at 217-19.

Dr. Kirk Brownell testified that he examined K.P. on the evening of March 18, 2004. VRP (Feb. 3, 2005) at 33-34. He said that K.P. told him she had been raped; the account that he said K.P. gave him was consistent with K.P.'s testimony at trial. *Id.* at 38-40. He testified that based on K.P.'s description of the rape, he did

not expect to find any physical injuries, that he did not find any, and that this was the case in about half of the sexual assault evaluations he performed. *Id.* at 41-43. Dr. Brownell explained that "[i]t's well known that . . . often a woman out of fear or many other factors may not resist in such a way that would make injury likely" and that "[vaginal] tissue is pliable elastic, stretchy and can absorb a fair amount of trauma." *Id.* at 44.

Officer Brent Thompson of the Mount Vernon Police Department testified that at about 6:00 p.m. on March 18, 2004, K.P. told him she had been sexually assaulted and that he took her to the hospital shortly thereafter. *Id.* at 66-68. He said that he took her full written statement at the hospital. *Id.* at 68. He described her demeanor as "withdrawn" at all times. *Id.* at 69.

Officer Joel McCloud, also with the Mount Vernon Police Department, testified that he was assigned on March 18, 2004, to investigate K.P.'s rape complaint. *Id.* at 77. For the investigation, Officer McCloud searched Colbert's apartment and interviewed K.P., Loomis, another woman, and Colbert. *Id.* at 79-81. Officer McCloud testified that although he spoke to K.P. more than once, she never told him about the incident in which Colbert exposed his penis to her. *Id.* at 88. He testified that he recorded an interview with Colbert, at which Colbert waived his right to an attorney. *Id.* at 89-91.

Olson testified that he was currently dating K.P. but did not think that the two were dating on March 18, 2004. *Id.* at 130. He testified that he had discussed the rape with K.P. only "[o]nce or twice, maybe" and explained that "[s]he doesn't care to discuss it." *Id.* at 141. He corroborated K.P.'s account of the incident in which Colbert exposed his penis to her, saying that she told him about it immediately after it occurred. *Id.* at 145. He testified that the incident made him angry but that he didn't confront Colbert about it because he wanted to "be there for [K.P.'s] children . . . [and] couldn't be an appropriate father figure . . . in a jail cell." *Id.* at 145-46. Olson also testified, however, that he forgot to mention the penis-exposure incident when he was initially interviewed by detectives for the rape investigation. *Id.* at 146. He said that K.P. left him a voice message on March 18, 2004, saying that there was an emergency and that when he saw her later that day, she was hysterical. *Id.* at 147. He said that since that day, K.P. had been less socially outgoing, had dressed more conservatively, and did not "discuss anything related to the incident." *Id.* at 150-51.

Defense counsel asked Olson whether, on the day of the alleged rape, K.P. had told him that "she wanted to call [Olson] first and sort it out and get the story straight before calling [the police]." *Id.* at 147. Olson emphatically denied that K.P. had ever made such a statement, but explained that when he first spoke to K.P. on March 18, 2004, she was so hysterical that he "told her that she needed to calm down

20

and relax so that she would be able to communicate in a proper manner if she decided to call the police." *Id.* at 147-48.

Finally, K.P.'s mother testified that in March 2004, K.P. and her two children occupied the master bedroom of the house where K.P.'s mother also lived. VRP (Feb. 7, 2005 (p.m.)) at 92. She stated that this room had a sliding glass door leading to the outside and another door leading to a hallway inside the house. *Id.* She testified that the door to the hallway had no "metal plates that would match up the doorknob closer" and therefore had never "been able to latch so it would close" as long as her family had lived there. *Id.* at 93-94. The State offered photographs of the door, illustrating its lack of any latching mechanism. This contradicted Colbert's testimony (discussed below) that the door locked and clicked.

The defense presented testimony by two witnesses: Colbert and Brandi Bowers, an investigator for the Skagit County Public Defender's Office.

Bowers testified that she interviewed Loomis in December 19, 2004. VRP (Feb. 4, 2005) at 5-6. She described Loomis as "seem[ing] protective of [K.P.]" and reluctant to speak with Bowers during this interview. *Id.* at 8. She also said that she called Loomis on February 1, 2005, to clarify some things; that someone other than Loomis answered the phone; and that Bowers believed this other person was K.P. *Id.* at 9-10. She also testified, however, that this other person might have sounded

21

like Loomis' sister. *Id.* at 11-12, 30-31. Bowers testified that she was present when defense counsel interviewed Olson, and that Olson told defense counsel that K.P. called him before she called the police so that they could "sort it out get the stories straight . . . because she said they wouldn't believe her." *Id.* at 21. On cross-examination, Bowers admitted that she did not videotape or audiotape her interview with Loomis, and that she did not actually write down anything in her notes about Loomis seeming reluctant or protective. *Id.* at 25-26.

Colbert testified that he was having a secret affair with K.P. while she was dating Olson and that on at least two occasions after Olson left for work, Colbert "sneak[ed] over" to K.P.'s bedroom for sexual contact short of intercourse. *Id.* at 112-13. Colbert also testified that the first sexual contact he had with K.P. occurred while Olson, K.P., Colbert, and others were all socializing at K.P.'s house and Olson was out getting food for everyone. VRP (Feb. 7, 2005 (a.m.)) at 69-70.

Colbert described this sexual encounter in various different ways. First, he testified that he asked K.P. to perform oral sex on him in her bedroom and that she willingly did so. VRP (Feb. 4, 2005) at 111. Later, he testified that K.P. was both "lying on the bed" and "sitting in a suggestive way," prompting Colbert to ask her "what's up?" VRP (Feb. 7, 2005 (a.m.)) at 76. He said that K.P. responded by getting up to lock the bedroom door, pushing him back down on the bed, and

22

unbuttoning his pants. *Id.* at 77. On direct examination, Colbert testified that he and K.P. were alone when this occurred. VRP (Feb. 4, 2005) at 111. On cross-examination, he said that after he asked K.P. to perform oral sex on him, "[s]he took her oldest child to the door, gave her to one of her sisters or something; then she closed the door and clicked it." VRP (Feb. 7, 2005 (a.m.)) at 70-71. Colbert gave a detailed description of the door's locking sound. He testified that K.P. "[s]hut and locked" the bedroom door, VRP (Feb. 4, 2005) at 111, and that he "heard a click . . . [l]ike a bolt lock turning," VRP (Feb. 7, 2005 (a.m.)) at 71.

When asked why he left K.P.'s house immediately after this incident, Colbert explained that he felt bad and couldn't face Olson, who would soon be returning with the food. *Id.* at 80. But he also testified that he (Colbert) quickly "got over it" and didn't avoid Olson in the days afterwards. *Id.* at 80. Colbert explained that K.P. had been unfaithful to Olson with many men and that if Olson wanted to be with "that kind of girl," it was his choice. *Id.* at 85.

Regarding the rape charge itself, Colbert testified that he and K.P. had vaginal intercourse for the first time on March 18, 2004, in his kitchen, after K.P. let herself into his apartment, smoked a cigarette with him, and then initiated sexual contact. VRP (Feb. 4, 2005) at 114-17. Colbert testified that they had sex in the kitchen in front of an uncovered window. *Id.* at 118. He said that the sex did not last long and

23

was not complete because the position hurt his back. *Id.* at 121-22. Colbert testified that he told "[a]lmost everybody I come in contact with," including Olson, about this sexual encounter. *Id.* at 126. He said that this made Olson "hot as a fire cracker." *Id.* Later he explained that he told Olson about the sex only after K.P. told Olson, when Olson came to Colbert's apartment on the evening of March 18, 2004, kicked his door open, and demanded that Colbert "defend [him]self." VRP (Feb. 7, 2005 (p.m.)) at 71. Colbert testified, "I told him his girlfriend was a ho and that she had been performing oral sex on me even before he knew it. I apologized to him for that. I told him if he wants to fight over a girl that's loose like that we could do it." *Id.* When asked how Olson reacted to those statements, Colbert said, "Well it broke his heart." *Id.*

Colbert theorized that K.P. and Loomis "cooked up" the conspiracy against him because they both wanted to sleep with him and, when K.P. "got [him] first," Loomis was angry. *Id.* at 47-48. He also suggested that K.P. made up the rape either because she was mad at him for selling his car, leaving Olson with no vehicle to borrow to get to work, or because K.P. needed to explain to Olson why she had had sex with Colbert and it was easy to accuse a black man of rape. *Id.* at 70. (On cross-examination, Colbert acknowledged that K.P. was not a white woman accusing a black man of rape, since K.P. is black. *Id.* at 80.) Finally, he said he couldn't explain

24

why K.P. would make up the rape but that "she might have . . . been super high one day." *Id.* at 79.

On cross-examination, Colbert testified that when he was served with the antiharassment petition, he threw it in the garbage; he claimed he did not understand that the notice advised him of his right to contest the petition at a hearing. VRP (Feb. 4, 2005) at 130-31.

The jury heard two completely different versions of what happened in this case and had the chance to evaluate the credibility of the defendant, the accuser, and the other witnesses. According to the State's theory, Colbert raped K.P. when she went to his apartment looking for cigarettes. According to the defense theory, Colbert and K.P. had been having a secret sexual affair for a few weeks when K.P. suddenly decided to tell her boyfriend about the affair and then successfully enlisted her boyfriend and another friend in a conspiracy to frame Colbert for rape. The State's theory was supported by the overwhelmingly consistent testimony of six separate witnesses. None of these witnesses was successfully impeached on cross-examination. The defense theory, on the other hand, was supported by two witnesses. One of these witnesses, investigator Bowers, provided testimony that was largely speculative. The other, Colbert, offered a version of events that was permeated with internal inconsistencies and, with respect to K.P.'s bedroom door,

25

directly contradicted by physical evidence. In light of this testimony, I cannot conclude that Colbert was actually and substantially prejudiced by the erroneous instruction on consent.

I recognize that consent was the sole contested issue in this case, since the physical act of sexual intercourse was not disputed. In a direct appeal, where the State would have to prove harmlessness beyond a reasonable doubt, a burden-shifting error on this central issue might well result in reversal. But in this collateral attack, Colbert bears the burden of proving that the error more likely than not affected the outcome. *Brockie*, 178 Wn.2d at 539. He has not met that burden.

## CONCLUSION

Under our precedent, the holding in *W.R.* is not a new rule of constitutional law triggering a presumption of nonretroactivity. Instead, it is based in significant part on statutory interpretation. I therefore respectfully dissent from the decision that *W.R.* does not apply retrospectively to this PRP. I concur in the majority's result, however, because I conclude that Colbert has now shown that he was actually and substantially prejudiced by the instructional error in this case.

26

_Gordon McCloud, J._

_Fairhurst, J._